**Case No. 23-5008**

In the United States Court of Appeals
for the Tenth Circuit

**United States of America**,
Plaintiff-Appellee,

v.

**Raymond Goldesberry**,
Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Oklahoma
The Honorable Judge John Antoon, II
D.C. Case No. 4:21-cr-00450

**Appellant's Opening Brief**

Office of the Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
Tel: (303) 294-7002
Fax: (303) 294-1192

Virginia L. Grady
Federal Public Defender

Josh Lee
Assistant Federal Public Defender
josh.lee@fd.org

Counsel for Raymond Goldesberry

Oral argument is requested.

July 11, 2023

# Table of Contents

**Page**

Table of Authorities ............................................................................. v

Prior or Related Appeals....................................................................... ix

Statement of Jurisdiction.......................................................................1

Issues ....................................................................................................1

Introduction ..........................................................................................1

Statement of the Case ...........................................................................3

I.      The Facts....................................................................................3

        A.      After K.G. gets into her parents' bed in the middle of the
                night, Mr. Goldesberry briefly touches her vagina; both
                agree it was an accident in that he mistook K.G. for his
                wife. ...............................................................................3

        B.      Years later, K.G. mentions the incident to a friend, who
                reports it to Child Protective Services. ............................6

        C.      CPS concludes that Mr. Goldesberry poses no risk to K.G..........7

II.     The Federal Charge ...................................................................8

        A.      Federal prosecutors indict Mr. Goldesberry on an offense
                carrying a mandatory sentence of 30 years in prison. ................8

        B.      Mr. Goldesberry maintains his innocence, refusing a deal
                to plead guilty to a lesser offense with a two-year
                sentence...........................................................................8

III.    The Trial ....................................................................................9

        A.      K.G.'s testimony.............................................................10

        B.      Meagan Bartlett's testimony .........................................10

C.    Nathan Bartlett's testimony ..............................................11

D.    The forensic interviewer's testimony ............................11

E.    CPS employees' testimony................................................12

F.    Michelle Goldesberry's testimony ..................................13

IV.   The Sentencing Hearing......................................................15

A.    Mrs. Goldesberry insists that her husband is innocent and describes how this prosecution has severely harmed K.G. .......15

B.    Mr. Goldesberry's adult daughter, Faith, insists he is innocent and describes the suffering this prosecution has caused..................................................................................16

C.    K.G. describes being traumatized by the prosecution and grieving the loss of her innocent father. ......................................17

D.    Mr. Goldesberry maintains his innocence..................18

F.    The judge imposes the mandatory 30-year sentence..................19

Summary of Argument .........................................................19

I.    Insufficient Evidence....................................................19

II.   Prosecutorial Misconduct.........................................21

Argument ...............................................................................23

I.    The Evidence Is Insufficient to Sustain the Conviction. .......23

A.    Preservation and standard of review ............................23

B.    Discussion...........................................................................24

1.    The Court must order an acquittal if a factfinder could not reasonably conclude that the defendant's guilt has been established beyond a reasonable doubt. ......................................................................24

2.      To establish Mr. Goldesberry's guilt, the
        prosecution was required to prove that Mr.
        Goldesberry knowingly engaged in a sexual act
        with K.G....................................................................27

3.      On this record, a factfinder could not reasonably
        conclude, beyond a reasonable doubt, that Mr.
        Goldesberry knowingly engaged in a sexual act
        with K.G....................................................................29

II.    The Prosecution Committed Serious Misconduct During
       Closing...........................................................................37

   A.   Prosecutors made plainly improper comments—
        misstating key testimony, distorting the record, and
        attacking Mr. Goldesberry's character. .........................38

        Improper Argument #1: False proclamations that K.G.
        never testified that, during the incident, she heard snoring
        and saw Mr. Goldesberry's eyes were closed. ...........................38

        Improper Argument #2: False assertion that K.G.
        "routinely" got into her parents' bed. .........................40

        Improper Argument #3: Deceptive attack on Mr.
        Goldesberry's character....................................................41

        Improper Argument #4: Baseless suggestions that Mr.
        Goldesberry is to blame for K.G.'s mental health problems.
        ...........................................................................44

   B.   The prosecutorial misconduct affected Mr. Goldesberry's
        substantial rights. ...........................................................46

        1.      The trial evidence made acquittal a real possibility. ........47

        2.      The prosecutors' improper remarks had a strong
                tendency to exert a malign influence. .................................47

        3.      The trial judge did not give a curative instruction. ..........50

iii

C.    The prosecutorial misconduct undermines the fairness, integrity, and public reputation of judicial proceedings............52

Conclusion...........................................................................................................52

Statement Requesting Oral Argument...............................................................53

Certificate of Compliance .................................................................................53

**Attachments:**

Attachment A:    Judgment

Attachment B:    Ruling on Motion for Judgment of Acquittal

# Table of Authorities

**Page**

## Cases

*Gov't of Virgin Islands v. Knight*,
  989 F.2d 619 (3d Cir. 1993) ...................................................29

*Hodge v. Hurley*,
  426 F.3d 368 (6th Cir. 2005) ..................................................40

*In re Winship*,
  397 U.S. 358 (1970) ...............................................................25

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ......................................................... 24, 25

*Le v. Mullin*,
  311 F.3d 1002 (10th Cir. 2002) ....................................... 48, 51

*Ohio v. Reiner*,
  532 U.S. 17 (2001) ................................................................36

*Old Chief v. United States*,
  519 U.S. 172 (1997) ..............................................................49

*Rosales-Mireles v. United States*,
  138 S. Ct. 1897 (2018) ..........................................................52

*United States v. Acosta*,
  924 F.3d 288 (6th Cir. 2019) ..................................................50

*United States v. Azubike*,
  504 F.3d 30 (1st Cir. 2007) ............................................. 47, 51

*United States v. Carter*,
  236 F.3d 777 (6th Cir. 2001) ........................................... 48, 51

*United States v. Charley*,
  1 F.4th 637 (9th Cir. 2021) ...................................................43

*United States v. Christy*,
   916 F.3d 814 (10th Cir. 2019) ...........................................................26

*United States v. Coulter*,
   57 F.4th 1168 (10th Cir. 2023) ............................................ 42, 43, 44

*United States v. Davis*,
   863 F.3d 894 (D.C. Cir. 2017) ..........................................................50

*United States v. Dobbs*,
   629 F.3d 1199 (10th Cir. 2011) ................................................. 26, 28

*United States v. Farmer*,
   770 F.3d 1363 (10th Cir. 2014) ................................................. 37, 52

*United States v. Garcia*,
   65 F.4th 1158 (10th Cir. 2023) ................................................. 24, 25

*United States v. Gregory*,
   54 F.4th 1183 (10th Cir. 2022) ................................................. 40, 43

*United States v. Hammers*,
   942 F.3d 1001 (10th Cir. 2019) ................................................ 40, 41

*United States v. Irvin*,
   682 F.3d 1254 (10th Cir. 2012) .........................................................26

*United States v. Lopez-Medina*,
   596 F.3d 716 (10th Cir. 2010) ..........................................................46

*United States v. Lovern*,
   590 F.3d 1095 (10th Cir. 2009) .......................................... 26, 31, 34

*United States v. Michel*,
   446 F.3d 1122 (10th Cir. 2006) .........................................................26

*United States v. Powell*,
   469 U.S. 57 (1984) ...........................................................................24

*United States v. Rahseparian*,
   231 F.3d 1257 (10th Cir. 2000) ................................................. 26, 33

*United States v. Rios,*
   611 F.2d 1335 (10th Cir. 1979) ........................................................43

*United States v. Rufai,*
   732 F.3d 1175 (10th Cir. 2013) ................................................ 25, 26

*United States v. Sanchez,*
   659 F.3d 1252 (9th Cir. 2011) .........................................................51

*United States v. Sanders,*
   240 F.3d 1279 (10th Cir. 2001) ......................................................26

*United States v. Smith,*
   814 F.3d 268 (5th Cir. 2016) ..........................................................48

*United States v. Starks,*
   34 F.4th 1142 (10th Cir. 2022) ................................................ 46, 52

*United States v. Sutton,*
   30 F.4th 981 (10th Cir. 2022) ................................................... 24, 25

*United States v. Truong,*
   425 F.3d 1282 (10th Cir. 2005) ......................................................26

*United States v. Washington,*
   783 F.3d 1198 (10th Cir. 2015) ......................................................26

*United States v. Washington,*
   962 F.3d 901 (7th Cir. 2020) ..........................................................43

*United States v. Weatherspoon,*
   410 F.3d 1142 (9th Cir. 2005) ........................................................50

*United States v. Willis,*
   102 F.3d 1078 (10th Cir. 1996). ....................................................24

*United States v. Wood,*
   207 F.3d 1222 (10th Cir. 2000) ......................................................26

*Washington v. Hofbauer,*
   228 F.3d 689 (6th Cir. 2000) ..........................................................43

vii

*Whittenburg v. Werner Enterprises Inc.*,
    561 F.3d 1122 (10th Cir. 2009) ................................................................. 50, 51

**Statutes**

18 U.S.C. § 1151 .................................................................................................8

18 U.S.C. § 1153 ............................................................................................8, 27

18 U.S.C. § 2241(c) .......................................................................................8, 27

18 U.S.C. § 3231 .................................................................................................1

18 U.S.C. § 3742 .................................................................................................1

**Rules**

Fed. R. Evid. 701 ..............................................................................................29

**Other Authorities**

Tenth Circuit Criminal Pattern Jury Instruction § 1.37 (2021 ed.) .................28

**Prior or Related Appeals:**

Mr. Goldesberry has not previously appeared before this Court, and counsel is not aware of any other pending cases raising issues similar to those that Mr. Goldesberry presents in this brief.

## Statement of Jurisdiction

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. The court entered judgment on January 25, 2023. R. I:9, I:153.[1] Mr. Goldesberry noticed appeal on January 30, 2023, R. I:9, I:161, which was timely under Fed. R. App. P. 4(b)(1)(A)(i). This Court has appellate jurisdiction under 18 U.S.C. § 3742.

## Issues

1.    Whether, in this sexual abuse case, the prosecution presented insufficient evidence that Mr. Goldesberry knowingly engaged in a sexual act with the alleged victim.

2.    Whether the prosecution committed reversible misconduct when, during closing, it repeatedly misstated the evidence and mounted an improper attack on Mr. Goldesberry's character.

## Introduction

Raymond Goldesberry was convicted of sexual abuse under very unusual circumstances. By all accounts, it was in the middle of the night, in a darkened bedroom, that a half-asleep Mr. Goldesberry fleetingly touched his daughter's vagina after she laid down in the place of Mr. Goldesberry's wife—who had been called into work overnight. When Mr. Goldesberry heard his daughter ask what he was doing, he immediately pulled his hand

---

[1] Citations to the record are given as "R. [volume number]:[page number]." The page number cited is the one at the bottom-right corner.

away, apologized profusely, and explained to his daughter that he had mistaken her for her mother. Since then, Mr. Goldesberry has consistently maintained that he did not know that his wife had left the bed and that this isolated incident was an accident.

But it's not just Mr. Goldesberry himself who says that it was unintentional. K.G. (the alleged victim) does, too. Now nearly eighteen, K.G. is just as sure now as she was at the time that Mr. Goldesberry never intended to touch her but, instead, had believed that the person lying in Mrs. Goldesberry's place was, in fact, Mrs. Goldesberry. The rest of Mr. Goldesberry's family—his wife of more than twenty years and his adult daughter—also insist that he is innocent and have supported him without reservation.

Nevertheless, after federal prosecutors caught wind of the incident, they turned it into a criminal case. Disregarding K.G.'s pleas not to prosecute her innocent father, they charged Mr. Goldesberry—who has zero criminal history, much less any prior history of sexual abuse—with an offense carrying a mandatory sentence of 30 years. Mr. Goldesberry pleaded not guilty, rejected a government offer to plead guilty to a lesser offense with a two-year sentence, and went to trial. After hearing a factually false closing argument from the prosecution that included flailing assaults on Mr. Goldesberry's character, the jury returned a guilty verdict.

Mr. Goldesberry and his family now look to this Court for relief. Mr. Goldesberry maintains on appeal that the prosecution presented insufficient evidence to prove the *mens rea* element of the offense of conviction—i.e.,

failed to prove that he knew he was engaging in a sexual act with K.G., as opposed to his wife. Mr. Goldesberry also maintains that prosecutorial misconduct substantially influenced the jury's decision to convict. This Court should reverse Mr. Goldesberry's conviction and direct a judgment of acquittal. At a minimum, the Court should vacate and remand for a new trial.

**Statement of the Case**

I.    **The Facts**

A.    **After K.G. gets into her parents' bed in the middle of the night, Mr. Goldesberry briefly touches her vagina; both agree it was an accident in that he mistook K.G. for his wife.**

Late one night in 2017, K.G. went to her parents' bedroom after having a nightmare. R. II:137, II:530, II:541-42. K.G. was either eleven or twelve years old at the time.[2] When she came into the dark room, her father, Mr. Goldesberry, was in bed asleep, snoring. R. II:137, II:142. Mr. Goldesberry's wife and K.G.'s mother, a labor-and-delivery nurse, had evidently been called into work in the middle of the night, because she wasn't there. R. II:173, II:411-12, II:419-20. K.G. laid down beside her father and fell asleep. R. II:137.

K.G. was startled awake when she felt her father's hand touching her vagina, moving inside her underwear. R. II:138-39. K.G. "freaked out," "jumped up," "turned around," and said, "'Dad, what are you doing?'" R. II:141, II:168. As soon as K.G. said the word "Dad," Mr. Goldesberry

---

[2] As developed below, there was conflicting evidence about whether the incident occurred before or after K.G.'s September birthday.

stopped, and "he apologized profusely," telling K.G. that he had mistaken her for her mother. R. II:141, II:170, II:174.

K.G. perceived at the time, has consistently reported, and continues to insist that Mr. Goldesberry's conduct was accidental. R. II:143, II:170, II:188. After all, K.G. had literally laid down in her mother's place while her father was asleep. The room was dark. R. II:142, II:403. And she and her mother were of similar size and had the same hairstyle. R. II:142, II:423; Gov't Ex. 5 (2017 photograph depicting K.G. on the left and her mother in the middle). By the time of the incident, K.G. was well into puberty: she had developed pubic hair and begun menstruating. R. II:177.

Additionally, Mr. Goldesberry had little reason to expect that his wife would not be in bed with him—much less that his daughter would be laying in her place. Although Mrs. Goldesberry had been called into work overnight on that particular occasion, she generally worked the day shift and slept beside her husband at night. R. II:419-20. And while this wasn't the first time K.G. had gotten into her parents' bed after having a nightmare, it was not a regular occurrence. R. II:173-74, II:404. Instead, it was something she did rarely: only "[s]everal times collectively over the years." R. II:173-74.

Further, it appeared to K.G. that her father had been only half-awake at the time of the incident. R. II:142, II:302. Mr. Goldesberry has a severe case of obstructive sleep apnea; he may become drowsy and start snoring even while sitting upright, having a conversation with someone, or participating in an important event. R. II:141, II:169, II:211, II:346-48, II:404-05. And when

K.G. had felt Mr. Goldesberry touching her that night, she also noticed that he was snoring. R. II:140, II:168-69, II:187. K.G. had noticed as well (when she jumped up and turned to ask what Mr. Goldesberry was doing) that Mr. Goldesberry's eyes were closed. R. II:141, II:168, II:187. And K.G. had observed that Mr. Goldesberry appeared disoriented after he opened his eyes. R. II:141.

Critically, Mr. Goldesberry had never done anything sexual or inappropriate to K.G. before—and he never did anything like that afterwards. R. II:172, II:181, II:188.

Immediately after Mr. Goldesberry apologized to K.G. that night, the two of them had a long conversation. R. II:141, II:363. Mr. Goldesberry focused on "making sure [K.G.] was okay." R. II:144, II:177. He also told K.G. that he wanted to tell Mrs. Goldesberry what had happened. R. II:176. But K.G. was "severely embarrassed" by the incident, and she implored Mr. Goldesberry not to mention it to her mother. *Id*. Mr. Goldesberry acquiesced to K.G.'s wishes. *Id*. During their conversation, Mr. Goldesberry and K.G. also "discussed ways to make sure something like this never happened again." R. II:175. Mr. Goldesberry told K.G. to wake him up if she ever came into her parents' bed while he was sleeping—so that he would know she was there. *Id*.

### B.    Years later, K.G. mentions the incident to a friend, who reports it to Child Protective Services.

After not telling anyone about the 2017 incident, K.G. mentioned it during a conversation with a young adult she knew, Meagan Bartlett, in May of 2020. R. II:143-44, II:178. The Bartletts were friends of the Goldesberrys (or at least seemed to be), and for a short time, Ms. Bartlett almost felt like an older sister to K.G. R. II:144, II:178. One day, K.G. was talking to Ms. Bartlett and decided to "unload" all the hard, sad, and embarrassing things in her life. R. II:145-46. K.G. suffers from Bipolar Disorder, a genetic psychiatric condition that runs in her family, and she spoke to Ms. Bartlett about her struggles with mental illness—including how she had begun "cutting." R. II:179-80 II:408-09. She told Ms. Bartlett about being severely bullied and subjected to body-shaming in school. R. II:145, II:178-79. She told her about the trauma of being an eyewitness to her great-grandmother's death. R. II:145, II:179. She told her about the trauma of being an eyewitness to her grandfather's death just six months later. *Id*. And she told her about the recent death of her beloved cat, Smokey. R. II:179. In the course of this conversation, K.G. "threw in," "[a]mong other embarrassing things," that her father had mistakenly touched her two-to-three years earlier. R. II:146, II:180. In telling Ms. Bartlett about the incident, K.G. "stated it was an accident." R. II:146.

Against K.G.'s expressed wishes, Ms. Bartlett then reported the 2017 incident to Oklahoma's Child Protective Services (CPS). R. II:146-48, II:195-

96. K.G. was furious and yelled at Ms. Bartlett when she learned what Ms. Bartlett had done. R. II:148-49, II:196.

### C. CPS concludes that Mr. Goldesberry poses no risk to K.G.

CPS began an investigation, and K.G. was subjected to a forensic interview by a woman named Kelsey Blevins. R. II:273. K.G., then fourteen, told Ms. Blevins that what had happened was unintentional on her father's part: he had been half-asleep, had mistaken her for her mother, and had apologized when he realized what he had done. R. II:168-70, II:302-03. She said that the incident was being "blown out of proportion," that Mr. Goldesberry was a good man, and that she felt safe with him. R. II:279, II:303.

CPS instructed the Goldesberrys that, during the investigation, K.G. and Mr. Goldesberry could have no contact. R. II:356-57. Mr. Goldesberry stayed at a hotel while K.G. remained at home. R. II:150, II:157-58, II:421. But the Goldesberrys could not afford to pay for a hotel room for the duration of the investigation, so K.G. eventually went to stay with relatives while Mr. Goldesberry returned to the home. R. II:158, II:421. K.G. was away for about a month, but Mrs. Goldesberry spent every weekend staying with her daughter. R. II:393, II:443.

After completing its investigation, CPS determined that K.G. could return to the home and live with Mr. Goldesberry. R. II:393-94. The Goldesberrys were cooperative with interventions intended to ensure that the incident was not repeated, and CPS ultimately concluded that there was no reason to be concerned about K.G.'s safety and closed the case. R. II:394-95, II:399.

After CPS reunited the family, the Goldesberrys lived together without incident for about a year. R. II:162.

## II.    The Federal Charge

### A.    Federal prosecutors indict Mr. Goldesberry on an offense carrying a mandatory sentence of 30 years in prison.

In October of 2021, the FBI arrested Mr. Goldesberry, and he was separated from his family again. R. II:162-63. It's not clear from the record how the Goldesberry case came to the attention of federal authorities. It is clear, however, that federal prosecutors had Mr. Goldesberry charged and arrested without ever speaking to (or making any effort to speak to) K.G. or anyone else in the Goldesberry family. R. II:21-22. Mr. Goldesberry was accused, based on the 2017 incident, of one count of Aggravated Sexual Abuse of a Minor Under 12 in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, and 2241(c). R. I:13.[3] That offense carries a mandatory minimum sentence of 30 years in prison. 18 U.S.C. § 2241(c).

### B.    Mr. Goldesberry maintains his innocence, refusing a deal to plead guilty to a lesser offense with a two-year sentence.

The government initially tried to induce Mr. Goldesberry to plead guilty by offering him a lesser offense that carried no minimum sentence. R. II:11. The offer provided that (1) the government would "cap its imprison-

---

[3] The parties would stipulate at trial that the Goldesberry home is within "Indian Country" and that Raymond Goldesberry qualifies as an "Indian" within the meaning of federal law. R. II:114-15.

ment recommendation at 14 years" (less than half the minimum for the indicted offense) and (2) Mr. Goldesberry could request any term of imprisonment he thought appropriate. *Id*. Mr. Goldesberry declined the offer.

Thereafter, the government tried an offer even further removed from the offense and sentence it had charged. Specifically, the government proposed that Mr. Goldesberry plead to sexual abuse of a minor *over* 12—an offense with no mandatory minimum and a maximum sentence of 15 years. R. II:82-84. Further, the government offered to recommend a sentence of two years (less than 7% of the 30-year minimum for the indicted offense), and it said that Mr. Goldesberry could request any sentence, including no imprisonment at all. *Id*. Mr. Goldesberry maintained his innocence.

## III.    The Trial

The case went to trial on the original, 30-year charge in March of 2022. Two elements were contested. First, the parties disputed the *mens rea* element—and, specifically, whether Mr. Goldesberry touched K.G.'s vagina with knowledge that he was touching K.G., rather than his wife. R. I:136, II:487-517. Second, the parties disputed the age element—i.e., whether the incident occurred before or after K.G.'s twelfth birthday in September 2017. *Id*.

### A.    K.G.'s testimony

The first witness was K.G. Now sixteen, she described the incident with her father,[4] and she told the jury that she's positive it was a mistake, not intentional. R. II:142, II:188. K.G. testified that she does not want her father to be prosecuted and feels that the government is not listening to her. R. II:135-36, II:182. K.G. characterized the charges as "completely ridiculous" and said that she regrets ever saying anything to Ms. Bartlett about the incident, "[b]ecause she blew it out of context." R. II:120, II:159. K.G. testified that she feels safe with her dad, misses him, and wants him to come home. R. II:182.

K.G. also told the jury that she was twelve years old when the incident occurred. R. II:152. She explained that it happened shortly after the family attended the state fair in 2017—which a Facebook post by her mother showed was in October, after her twelfth birthday in September. R. II:117, 171-72; Gov't Ex. 5.

### B.    Meagan Bartlett's testimony

The woman to whom K.G. first mentioned the incident, Meagan Bartlett, testified next. She told the jury that she and her father were friends of the Goldesberrys. R. II:190-92. She said that, during May of 2020, she learned

---

[4] The precise character of the touching was established and is undisputed: K.G. testified that she awoke and called out because she felt a hand inside her underwear, moving slightly and "touching my vagina"—on "the outside" and "barely the inside," R. II:138-II:141, just past the labia majora, R. II:374-75, II:493.

some things regarding K.G. that concerned her. R. II:192-95. And she explained that, after discussing the matter with her father, she contacted CPS. R. II:196.

### C.     Nathan Bartlett's testimony

Ms. Bartlett's father, Nathan Bartlett, also testified. Mr. Bartlett said that, in 2020, he was working as a law enforcement officer and had been in law enforcement for two decades. R. II:219-20. Mr. Bartlett was a "mandatory reporter." R. II:222-23. He said that he encouraged his daughter to report what she had heard and was present when she made the call. *Id*.

Mr. Bartlett then described a conversation he had with Mr. Goldesberry after Mr. Goldesberry learned that the Bartletts had made a report to CPS. According to Mr. Bartlett, Mr. Goldesberry was sobbing and said that he had "messed up." R. II:225-26. Mr. Bartlett also testified that Mr. Goldesberry asked whether then-Officer Bartlett was speaking to him as a friend or as a police officer. R. II:226.

### D.     The forensic interviewer's testimony

The woman who conducted a forensic interview of K.G., Kelsey Blevins, was the next witness. Ms. Blevins repeated K.G.'s 2020 account of the incident (which was the same as K.G.'s trial testimony). R. II:278-80, II:302-03. Ms. Blevins testified that, during the interview, K.G. was "protective" of her father and said she didn't feel like what happened was that big of a deal. R. II:278-80. On direct examination, Ms. Blevins opined that K.G. "exhibited" the "characteristic" of "minimizing." *Id*.

On cross-examination, Ms. Blevins clarified that she was using the word "minimizing" as a term of art that was not intended to convey any opinion about what happened in 2017 or about the completeness of K.G.'s account. R. II:294-98, II:309-14, II:319, II:322. Ms. Blevins explained that, if a child told her that an incident was an accident or that it only happened once, she would deem this "characteristic of minimizing" even if it really was accidental and actually did only happen once. R. II:294-98. Ms. Blevins acknowledged having no reason to believe that K.G.'s account of the 2017 incident was anything other than 100% accurate. R. II:322.

### E.    CPS employees' testimony

Three CPS employees testified.

Deniece Ishem testified that she "facilitate[d] a child safety meeting" with the Goldesberrys in June of 2020 and that they discussed the report that Mr. Goldesberry had touched K.G.'s vagina. R. II:328-29. Mr. Goldesberry "confirm[ed] that this incident with [K.G.] had happened." R. II:329. He was remorseful but maintained that he had believed he was touching his wife, not his daughter. R. II:331-32. Ms. Ishem testified that, while Mr. Goldesberry was not able to recall what year the incident occurred in, he suggested that it was approximately three-to-four years ago—which, if taken literally, would have been before K.G.'s twelfth birthday. R. II:329, II:331.

Brenna Gusman was assigned to the Goldesberry case as an investigator. R. II:353-54. She told the jury that Mr. Goldesberry had no prior child

welfare history and no criminal history. R. II:369-70. She testified that, during a June 2020 interview with her, Mr. Goldesberry "was forthcoming" and, again, acknowledged that the touching being investigated did occur. R. II:361-63, II:374-75, II:379. When Ms. Gusman asked him whether he penetrated K.G. with his finger, Mr. Goldesberry (a medical professional) indicated that he touched past the labia majora and asked whether this constituted "penetration." R. II:374-75. Ms. Gusman also testified that Mr. Goldesberry told her the incident had happened three-to-four years ago. R. II:380.

Given that everyone agreed that the touching indeed had occurred, Ms. Gusman had no option other than to deem Ms. Bartlett's report "substantiated." R. II:367-68, II:376. Ms. Gusman recommended counseling for K.G. and services for the Goldesberry family to ensure that nothing like what happened in 2017 ever happened again. R. II:364-65.

Carla Barboza testified about how the CPS case wrapped up. She said that the Goldesberrys were cooperative with CPS's suggested interventions and did everything that was asked of them. R. II:394. She testified that K.G. returned to the home after about 30 days and that CPS determined she could safely live with Mr. Goldesberry. R. II:393-94. Ultimately, Ms. Barboza said, CPS concluded that there was no reason to be concerned about K.G. and closed the Goldesberry case. R. II:394-95, II:399.

### F.    Michelle Goldesberry's testimony

Michelle Goldesberry testified that she has been married to Mr. Goldesberry for more than two decades. R. II:400. She said that, throughout their

13

marriage, Mr. Goldesberry would often initiate sex with her in the middle of the night and would do so by reaching over to touch her vagina with his hand. R. II:405-06. This was typical for their relationship, and Mrs. Goldesberry would sometimes reciprocate and sometimes brush him off. *Id*.

Mrs. Goldesberry also explained that, when she got called into work overnight, she often did not disturb Mr. Goldesberry enough for him to wake up and realize that she was leaving. R. II:412-13.

Mrs. Goldesberry testified that she first learned about the 2017 incident when CPS called her in May of 2020. R. II:400-01. She was shocked and concerned about K.G. R. II:401-02. Her first priority was "[m]aking sure [K.G.] was safe and she was okay." R. II:402. After speaking with her daughter, Mrs. Goldesberry concluded that the reason she had not been told earlier is that K.G. "was really embarrassed, and she didn't want anyone to know." R. II:402-03. And after separately speaking with both K.G. and Mr. Goldesberry about what happened, Mrs. Goldesberry concluded that the incident had been a mistake, not intentional. R. II:417, II:432-33.

\* \* \*

Following Mrs. Goldesberry's testimony, the jury heard a closing argument from the prosecution that repeatedly mangled the record, attacked Mr. Goldesberry's character, and conveyed an absolute certainty that he molested K.G. on purpose. *See infra* at 29-45. Thereafter, the jury found Mr. Goldesberry guilty. R. II:514-15.

## IV.   The Sentencing Hearing

A sentencing hearing (in front of a new judge) followed. It was inevitable that Mr. Goldesberry would receive the 30-year sentence mandated by statute. Still, every member of the Goldesberry family chose to speak.

### A.   Mrs. Goldesberry insists that her husband is innocent and describes how this prosecution has severely harmed K.G.

Michelle Goldesberry said that this prosecution has "devastated and destroyed" her family and has "traumatized K.G. far beyond what her father accidentally did to her on a single occasion"—something that K.G.'s counselors have confirmed. R. II:20-22, II:28-29. Mrs. Goldesberry told the court that "K.G. knows without a shadow of a doubt that her dad thought I was the person in bed and what happened was not intentionally done, but truly an accident." R. II:21. According to Mrs. Goldesberry, the government made no effort to consult with anyone involved before prosecuting her husband: prosecutors "didn't even bother asking to meet with K.G." or anyone else in the Goldesberry family "to find out what we had to say." R. II:21-22. She declared that "[t]he people who are prosecuting Raymond," purportedly on behalf of K.G., are "actually the people who victimized K.G." R. II:22. And she said that "[t]he real injustice in this case is that nobody listened to K.G.," and "an innocent man went to prison because nobody listened to her." R. II:26-27.

Mrs. Goldesberry described how, after K.G. heard the guilty verdict, "she collapsed in the middle of the street and refused to get up, saying she

wanted to die." R. II:23. Mrs. Goldesberry said that, in the months since, "K.G. had to get a job because we no longer have my husband's income and cannot live off of my income alone." *Id.* And she explained that K.G. misses her dad terribly, is "grieving for the loss of her father's presence in her life," and "wants [him] released as soon as possible." R. II:21, II:29.

Ultimately, Mrs. Goldesberry told the court that the entire family wants the case dismissed. R. II:29.

### B.   Mr. Goldesberry's adult daughter, Faith, insists he is innocent and describes the suffering this prosecution has caused.

Mr. and Mrs. Goldesberry's adult daughter, Faith Goldesberry, also gave a statement. She declared her father "an innocent man" and characterized it as "insanity" that he has been prosecuted "because of a simple accident." R. II:30, II:35. She explained that "there was no intent" behind his actions and that there had been "no previous or subsequent incidents." R. II:31. She opined that federal prosecutors have been blinded by a "savior complex" that render them "completely oblivious to the fact that they themselves are causing more harm and trauma to an entire family" than "the incident … ever caused my sister." R. II:30.

Faith described herself as "caught somewhere between seething rage and crippling grief." R. II:32. She said that the stress of her father being prosecuted has caused her to develop fibromyalgia, saddling her with chronic pain and fatigue that may plague her for the rest of her life. R. II:32. And she described missing her dad "more than I ever thought possible." R. II:34. She

16

said that she misses "being the first to hug him when he gets home from work," listening to music with him "and getting excited when one of us wants to show the other a new song," having "living room dance parties with him," engaging in "debates with my dad … without worrying about being loved any less for a difference in opinion," seeing her parents together and their love for each other, and having her dad be there "to help calm my anxiety." R. II:34-35. She said that, even though she is an adult, "I will always need my dad," and "I need him to come home." R. II:35.

Faith concluded by "implor[ing]" the judge "to reconsider this case and help reunite our family." R. II:35.

### C. K.G. describes being traumatized by the prosecution and grieving the loss of her innocent father.

K.G., now seventeen, spoke to insist that she was not victimized by her father but, instead, is "the victim of this case." R. II:36. She said that she knew from the start that what her father did "was a complete accident." R. II:38. She explained, "I didn't feel hurt because I knew he would never intend to hurt me." *Id*.

K.G. said she has "never been heard throughout this whole process" and felt as if prosecutors only wanted a conviction and "never cared about what I wanted, what I needed and what was best for me." R. II:36, II:38-39. K.G. thought it telling that prosecutors charged her father after CPS had already "investigated this event," "determined it was all a mistake," and "allowed my family to be reunited." R. II:38.

17

K.G. explained that she has traumatic memories of learning the guilty verdict—when she "just sunk into the pews," "heard the handcuffs click," and "was never able to say goodbye." R. II:42. She spoke of "frequent nightmares" about her father's persecution. R. II:39-40. She described the "most recent" nightmare as being that she was suddenly "surrounded by FBI agents" who first "played a recording of an executioner reading my dad's charges followed by a gunshot" and then told her, "'We thought you should know, your dad is dead.'" R. II:39-40.

K.G. also spoke of missing her father—of how they used to cook together, work on the car together in his shop, and have family game nights. R. II:40. K.G. explained, "If I lose him, he won't be able to bring me flowers when I graduate, walk me down the aisle when I get married, build a crib for my children, see me grow up into an amazing woman that my parents have helped raise." R. II:41. K.G. said she had not "been able to hug [her father] in over a year" and pleaded with the judge to do something. R. II:42.

### D.    Mr. Goldesberry maintains his innocence.

Mr. Goldesberry spoke on his own behalf. He expressed "immense[] regret" that the touching incident had occurred but maintained his innocence in that "my intention was for my wife and not my child." R. II:44. He explained:

> I had no knowledge that my wife had been called in to work that morning or that my daughter had laid down in my wife's side of the bed in her absence. When I went to sleep, my wife was next to me. When I reached over, which is what I have done many

times in 22 years [of marriage], I had no idea that my daughter would be there.

R. II:43-44. He expressed gratitude that "my wife and my daughters love and support me because they know the truth and they know me." R. II:44-45.

### F.    The judge imposes the mandatory 30-year sentence.

The prosecution didn't say anything in response to the Goldesberrys' statements—or in defense of imprisoning Mr. Goldesberry for 30 years. The judge said that his hands were tied: "Well, just so it's clear, … I was not the trial judge," and "there is no motion to dismiss pending before me. The only issue that I've been asked to do is to impose sentence …. There are forums … for you to go to another court and explain why this was a miscarriage of justice." R. II:43. The court explained that it was "required today to enter the mandatory minimum sentence … of 360 months." R. II:46.

This appeal followed.

### Summary of Argument

## I.    Insufficient Evidence

This Court should reverse because the evidence is insufficient to sustain Mr. Goldesberry's conviction. Based on the trial record, a factfinder could not reasonably conclude that the government proved beyond a reasonable doubt that Mr. Goldesberry touched K.G. knowingly, rather than because of mistake or accident.

A reasonable factfinder would necessarily entertain a reasonable doubt because the evidence is at least as consistent with innocence as with

guilt. On the night in question, K.G. came into her parents' bedroom after her father had gone to sleep, and she laid down in the place of her mother—who had been unexpectedly called into work overnight. The room was dark, and K.G. was roughly the same size as Mrs. Goldesberry. It was typical for Mr. Goldesberry to try to initiate sex with Mrs. Goldesberry in the middle of the night—and to do so by reaching over and touching her vagina. That night, Mr. Goldesberry reached over and fleetingly touched K.G. in that way, but when he heard her call out, he immediately stopped, apologized, and told K.G. that he had mistaken her for Mrs. Goldesberry. Mr. Goldesberry had never done anything sexual or inappropriate to K.G. before, and he never did anything like that afterwards. Under these circumstances, it's not just possible that this was a mistake or accident—it's likely. No reasonable factfinder could conclude that the evidence proved beyond a reasonable doubt that Mr. Goldesberry knew that it was K.G. who he reached to touch.

During its closing, the prosecution argued that it's implausible that Mr. Goldesberry mistook his daughter's genital area for his wife's. But that's specious on the facts of this case. K.G. had pubic hair, and there was no evidence that her genital area was otherwise palpably distinguishable from Mrs. Goldesberry's. More importantly, the entire incident was over within a matter of seconds: K.G. called out when she was touched, and Mr. Goldesberry stopped immediately. There's no basis in the evidence for the prosecution's assumption that Mr. Goldesberry had time to catch his own mistake and stop before K.G. reacted and he did stop.

Beyond the *actus reus* of the alleged offense, all the prosecution had was an argument that Mr. Goldesberry's subsequent conduct evinced a consciousness of guilt. But the fact that Mr. Goldesberry was conscious of having done something bad is perfectly consistent with the defense's case that he touched his daughter's vagina because of mistake or accident. Indeed, the defense itself presented evidence and argument that Mr. Goldesberry felt remorse over what he had done—because, if anything, his appreciation that touching his daughter was wrong supported the case that what happened was an accident. Regardless, the prosecution's consciousness-of-guilt theory failed in its particulars: to present such an argument, the prosecution had to badly distort the record. Further, even if the facts had been as the prosecution wrongly asserted, they would not have suggested that Mr. Goldesberry's touching of K.G. was anything other than an accident.

In short, a reasonable factfinder could not conclude that the government met its burden of proof on the *mens rea* element, so this Court should reverse.

## II.   Prosecutorial Misconduct

Alternatively, the Court should order a new trial because the prosecution presented four plainly improper arguments during closing.

First, the prosecution misstated K.G.'s testimony. It falsely told the jury that K.G. had not testified that she heard Mr. Goldesberry snoring and saw that his eyes were closed at the time of the incident. In reality, K.G. *had* given

this testimony, and the prosecution's insistence that she had not unfairly undercut the defense's theory that Mr. Goldesberry did not act knowingly because he was half-asleep at the time of the touching.

Second, the prosecution misstated the record by informing the jury that K.G. *routinely* got into her parents' bed overnight. In reality, two witnesses specifically testified that this was *not* a routine occurrence, and there was zero evidence that it was. The prosecution's misstatement of the record in this respect unfairly undercut the case for accident by making it appear that Mr. Goldesberry had reason to know that K.G. might be in bed with him.

Third, the prosecution launched a deceptive and impermissible attack on Mr. Goldesberry's character. The prosecution offered a diatribe against Mr. Goldesberry for (in the prosecution's telling) sending K.G. away during the CPS investigation so that he could stay in the home. The prosecution suggested that this conduct exposed Mr. Goldesberry as the type of person who pursues his own interests at the expense of his daughter's. This prejudicial, character-based argument distorted the record in multiple respects and encouraged the jury to convict on an illegitimate basis.

Fourth, the prosecution baselessly blamed Mr. Goldesberry for K.G.'s mental health problems, arguing that she "deteriorated" after the 2017 incident because Mr. Goldesberry induced her to keep it a secret and did nothing to help her. This inflammatory accusation had no evidentiary support. There

was no testimony attributing K.G.'s psychiatric symptoms to the 2017 incident. Mr. Goldesberry did not induce K.G. to keep the 2017 incident a secret. And the Goldesberrys got K.G. appropriate treatment when she began to experience mental health problems.

All of the foregoing plainly constitutes prosecutorial misconduct under Tenth Circuit precedent.

The misconduct also affected Mr. Goldesberry's substantial rights. The evidence of *mens rea* was weak. The prosecution's improper remarks—all of which were aimed squarely at the *mens rea* element—had a strong tendency to exert a malign influence. And the trial judge did not give a curative instruction.

Accordingly, if the Court does not order an acquittal, it should order a new trial.

## Argument

### I.    The Evidence Is Insufficient to Sustain the Conviction.

This Court should reverse because the evidence is insufficient on the *mens rea* element: the prosecution did not prove beyond a reasonable doubt that Mr. Goldesberry acted knowingly, rather than because of mistake or accident.

### A.    Preservation and standard of review

Mr. Goldesberry presented his sufficiency claim below. He moved for a judgment of acquittal both at the close of the government's case and at the close of the defense's case, arguing that the evidence failed to prove that he

acted knowingly. R. II:380-84, II:447. The judge denied the motion. R. II:544. Accordingly, the question presented is preserved for appeal. *See United States v. Willis*, 102 F.3d 1078, 1083 (10th Cir. 1996).

This Court "review[s] the denial of a judgment of acquittal for insufficient evidence de novo." *United States v. Garcia*, 65 F.4th 1158 (10th Cir. 2023).

## B.  Discussion

### 1.  The Court must order an acquittal if a factfinder could not reasonably conclude that the defendant's guilt has been established beyond a reasonable doubt.

The right to proof beyond a reasonable doubt "requires more than simply a trial ritual." *Jackson v. Virginia*, 443 U.S. 307, 316-17 (1979). Rather, the government must both "convince the jury with its proof" and then "also satisfy the courts" that the evidence permits a reasonable conclusion that the defendant is guilty beyond a reasonable doubt. *United States v. Powell*, 469 U.S. 57, 67 (1984). Put differently, "the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Garcia*, 65 F.4th at 1201 (quoting *Jackson*, 443 U.S. at 317 n.10)).

In adjudicating a claim that the evidence is insufficient, this Court "consider[s] the evidence in the light most favorable to the government" in order to "determine whether a reasonable jury could have found guilt beyond a reasonable doubt." *United States v. Sutton*, 30 F.4th 981, 983 (10th Cir. 2022). Because the function of sufficiency review is to protect a defendant's

right to proof beyond a reasonable doubt, "[a]n appellate court must consider the burden of proof in its sufficiency of the evidence analysis." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013). This means that the question "is not whether *some* evidence could have reasonably supported a guilty verdict," nor is it "whether a rational jury could decide that guilt was more likely than not." *Id.* Instead, the "critical inquiry" is "whether the record evidence could reasonably support a finding of guilt *beyond a reasonable doubt*," *Jackson*, 443 U.S. at 318 (emphasis added)—i.e., whether a factfinder could reasonably conclude that the defendant's guilt has been established "with utmost certainty," *In re Winship*, 397 U.S. 358 (1970).

This Court's role in safeguarding the reasonable doubt standard is not merely theoretical. The Supreme Court recognized in *Jackson* that "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." 443 U.S. at 317-18. And the intervening decades have shown that, unfortunately, this may be an understatement. This Court's case law demonstrates that, in recent years, convictions upon insufficient evidence have not been rare—and that many errors of this kind involve inadequate proof that the defendant acted with the required *mens rea*.[5]

---

[5] *See, e.g., Garcia*, 65 F.4th at 1201-06 (insufficient evidence that homicide was committed with intent to further a racketeering enterprise); *Sutton*, 30 F.4th at 984-90 (insufficient evidence that defendants had knowledge they were obstructing a federal proceeding); *United States v. Christy*, 916 F.3d 814, 850-

The pattern in such cases is that the defendant is involved in something bad happening—someone died, people lost money, drugs were transported, child pornography was circulated—and the factfinder too readily concludes that the defendant caused it on purpose or otherwise acted with the mental state attributed to him by the prosecution. When that occurs, this Court has not hesitated to discharge its duty to vindicate the defendant's right to proof beyond a reasonable doubt.

---

53 (10th Cir. 2019) (insufficient evidence of specific intent in money laundering case); *United States v. Washington*, 783 F.3d 1198, 1199-1204 (10th Cir. 2015) (insufficient evidence that passenger had knowledge a distributable quantity of drugs were in the car); *Rufai*, 732 F.3d at 1191-95 (insufficient evidence that defendant had knowledge of or intent to aid healthcare fraud); *United States v. Irvin*, 682 F.3d 1254, 1274 (10th Cir. 2012) (insufficient evidence that defendant had knowledge of co-defendant's supervised release conditions so as to support the former's conviction for aiding and abetting the latter's violation of those conditions); *United States v. Dobbs*, 629 F.3d 1199, 1202-09 (10th Cir. 2011) (insufficient evidence that defendant's receipt of child pornography was "knowing"); *United States v. Lovern*, 590 F.3d 1095, 1104-09 (10th Cir. 2009) (insufficient evidence that pharmacy tech knew prescriptions were illegitimate); *United States v. Michel*, 446 F.3d 1122, 1127-32 (10th Cir. 2006); *United States v. Truong*, 425 F.3d 1282, 1291 (10th Cir. 2005) (insufficient evidence that defendant knew ephedrine and pseudoephedrine he sold would be used to make meth); *United States v. Sanders*, 240 F.3d 1279, 1281-84 (10th Cir. 2001) (insufficient evidence that defendant knew that attachment to gun was a silencer); *United States v. Rahseparian*, 231 F.3d 1257, 1262-67 (10th Cir. 2000) (insufficient evidence that defendant knew that telemarketing business was unlawful); *United States v. Wood*, 207 F.3d 1222, 1229-34 (10th Cir. 2000) (insufficient evidence that defendant caused death with premeditation or malice aforethought).

**2.    To establish Mr. Goldesberry's guilt, the prosecution
was required to prove that Mr. Goldesberry knowingly
engaged in a sexual act with K.G.**

Mr. Goldesberry has repeatedly acknowledged that he touched K.G.'s
vagina (and has repeatedly expressed regret that this occurred). However,
he has also consistently maintained that it was an accident: he did not realize
that K.G. was laying in his wife's place in bed when he reached over in that
dark bedroom. And the prosecution was required to prove that Mr. Goldes-
berry knew he was touching K.G.—i.e., that he did not do so because of mis-
take or accident.

Mr. Goldesberry was charged with and convicted of Aggravated Sex-
ual Abuse in Indian Country, in violation of 18 U.S.C. §§ 1153 and 2241(c).
R. vol. I at 13, 147.  The Aggravated Sexual Abuse statute provides in rele-
vant part that a person is guilty of that offense if "he *knowingly* engages in a
sexual act with another person who has not attained the age of 12 years …
or attempts to do so." 18 U.S.C. § 2241(c) (emphasis added). Section 1153
provides for federal jurisdiction when a violation of § 2241(c) is committed
by "[a]ny Indian … within Indian country."

As the trial judge instructed, this offense required proof of the follow-
ing elements:

> *First*:     the defendant knowingly engaged in or attempted to engage in a sexual act with M.V.;[6]
>
> *Second*:   at the time, M.V. had not attained the age of 12 years;
>
> *Third*:    the defendant is an Indian; and
>
> *Fourth*:   the act occurred in Indian country within the Northern District of Oklahoma.

R. I:136, II:527.

Here, Mr. Goldesberry maintains that the evidence was insufficient on the first element—and, in particular, insufficient to prove that he touched K.G. "knowingly." In accordance with this Court's case law and pattern instructions, the district court instructed the jury that, to find that Mr. Goldesberry engaged in this conduct "knowingly," it had to find "that the act was done voluntarily, intentionally, *and not because of mistake or accident*." R. II:506 (emphasis added); *see* 10th Cir. Crim. Pattern Jury Instr. No. 1.37 (2021); *see also United States v. Dobbs*, 629 F.3d 1199, 1203-04 (10th Cir. 2011) (holding that this definition of "knowingly" is proper because it is "consistent with the ordinary and everyday meaning of the word").

As applied to this case, then, the sufficiency inquiry requires this Court to determine whether a factfinder could reasonably conclude that the trial evidence proves beyond a reasonable doubt that Mr. Goldesberry touched K.G. knowingly, rather than because of mistake or accident.

---

[6] The jury was instructed that the designation "M.V." referred to K.G. *See* R. II:487. Evidently, for a time, the U.S. Attorney's Office referred to some children as "M.V." (for "minor victim"), instead of using their real initials. R. II:55.

### 3.    On this record, a factfinder could not reasonably conclude, beyond a reasonable doubt, that Mr. Goldesberry knowingly engaged in a sexual act with K.G.

Even considered in the light most favorable to the government, the evidence fails to support a finding that the prosecution proved beyond a reasonable doubt that Mr. Goldesberry knowingly engaged in a sexual act with K.G. Typically, the prosecution explains in its closing argument why it believes it has satisfied its burden of proof. In this case, however, an assessment of the prosecution's closing argument reveals why Mr. Goldesberry's conviction cannot be sustained.[7]

To start, the prosecution told the jury that there was no evidence of mistake other than Mr. Goldesberry's own assertions that he thought he was touching his wife. R. II:514, II:517. But that's obviously wrong. For one thing, K.G.'s unwavering insistence that Mr. Goldesberry's conduct was an accident—a view she formed based on her first-hand perceptions of her father's behavior before, during, and after the incident, R. II:143, II:187-88—was significant lay opinion evidence. *See* Fed. R. Evid. 701; *cf. Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 629-30 (3d Cir. 1993) (error to exclude eyewitness's opinion that shooting was accidental).

---

[7] For purposes of his sufficiency claim, Mr. Goldesberry assesses only those aspects of the prosecution's closing argument that were not plainly improper. As shown in the discussion of Issue 2, *infra*, a significant part of the prosecution's closing amounted to misconduct. The improper remarks bear upon Mr. Goldesberry's sufficiency claim only to the extent that it's revealing that prosecutors felt the need to engage in such tactics.

More importantly, a defendant's mental state is typically proven through circumstantial evidence. (The prosecution itself certainly presented no direct evidence of *mens rea*.) And the circumstantial evidence in this case included the following, none of which was contradicted by any other evidence:

- Mrs. Goldesberry (a hospital nurse and Mr. Goldesberry's wife of more than 20 years) usually worked the day shift and slept in bed beside Mr. Goldesberry at night. R. II:405, II:412, II: 419-20.

- Mr. and Mrs. Goldesberry had an active sex life, and it was typical in their relationship for Mr. Goldesberry to initiate sex by reaching over and touching Mrs. Goldesberry's vagina with his hand—something he often did in bed in the middle of the night. R. II:405-06, II:425.

- Mrs. Goldesberry occasionally got called into work overnight, and when this happened, she often didn't disturb her husband enough for him to wake up and realize she was leaving. R. II:412-13.

- On the night of the incident, Mrs. Goldesberry had been called into work in the middle of the night, and K.G., after having a nightmare, got into bed beside Mr. Goldesberry. R. II:137, II:173.

- When K.G. came into her parents' room and laid down, she heard her father snoring and perceived that he was asleep. R. II:137.

- K.G. rarely got into her parents' bed overnight. R. II:173-74, II:404.

- The room was dark. R. II:142, II:403.

- Despite being eleven or twelve years old, K.G. was not smaller than Mrs. Goldesberry in 2017 (R. II:142, II:423, Gov't Ex. 5) and, if anything, may have been slightly taller (R. II:425).

- K.G. did not otherwise have a young child's body: she had developed pubic hair and begun menstruating. R. II:177.

- When Mr. Goldesberry touched K.G.'s vagina, he did so only fleetingly: K.G. exclaimed as soon as she felt his hand there, and he stopped immediately. R. II:141, II:174.

- Mr. Goldesberry had never done anything sexual or inappropriate to K.G. before, and he never did anything like that afterwards. R. II:172, II:181, II:188.

This Court has held that, where "the evidence gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [the Court] must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Lovern*, 590 F.3d 1095, 1107 (10th Cir. 2009). To say that the circumstantial evidence here is *equally* consistent with an inference of innocence would be an understatement. The facts depict a perfect storm of circumstances that make it *likely* this was an accident.

In arguing otherwise, the prosecution contended that what happened could not have been accidental because it's implausible to suppose that someone could mistake his eleven-year-old daughter's genital area for that of his thirtysomething wife. R. II:495, II:515. But this argument has appeal only if you abstract away from the specific circumstances of this case. Here, the trial evidence failed to show (1) that K.G.'s genital area was markedly and palpably different from Mrs. Goldesberry's or (2) that Mr. Goldesberry would have had time to catch his own mistake before K.G. reacted and the whole thing was over. In fact, undisputed evidence belies both of these propositions.

Again, the evidence showed that, before she turned eleven, K.G. had already grown pubic hair (which she did not groom). R. II:177. And there was nothing about K.G.'s vaginal area—such as a scar, a mole, or raised or textured skin—that would immediately distinguish her body from anyone else's. R. II:177-78. Likewise, Mrs. Goldesberry did not regularly groom her pubic hair, and she, too, lacked any scars, moles, or tissue that made her vaginal area immediately distinct. R. II:413. There was no other evidence on this topic.

Moreover, because the entire incident was over so fast, the notion that K.G.'s genital area should have felt different from Mrs. Goldesberry's—even if true—does nothing to show that what happened was anything but an accident. The prosecution's argument that Mr. Goldesberry would have noticed the difference amounted to an argument that, if this had truly been a mistake, Mr. Goldesberry would have stopped right away. But that's exactly what he did. He *did* stop right away. There was no evidence that this incident lasted more than a matter of seconds. When K.G. felt herself being touched, she "freaked out," "jumped up," and called out—"as any sane person would do." R. II:141. The prosecution characterized the evidence as showing that K.G. "reacted instantly" to being touched. R. II:513. And Mr. Goldesberry pulled his hand away as soon as K.G. called out. R. II:174. Accordingly, there's no basis in the evidence for an assumption that, in the case of a mistake, Mr. Goldesberry would have registered a problem and stopped what

he was doing before he, in fact, did stop what he was doing. And that is the critical assumption on which the prosecution's whole argument rests.

Ultimately, what the prosecution was asking the jury to do was to infer *mens rea* from the *actus reus* itself. But that's allowed "only where th[e] inference can be made beyond a reasonable doubt." *United States v. Rahseparian*, 231 F.3d 1257, 1264 (10th Cir. 2000). For the reasons above, the particular circumstances of this case don't support an inference beyond a reasonable doubt that Mr. Goldesberry knew it was K.G. who he reached over to touch. On the contrary, an inference of *mens rea* on the specific facts presented here requires "a degree of speculation and conjecture" that renders it "a guess or mere possibility." *Id*. at 1262. And a conviction cannot be upheld on such a basis. *Id*.

Other than the *actus reus*, all the prosecution had was an argument that Mr. Goldesberry's subsequent conduct evinced a consciousness of guilt. But its argument was meritless—both in theory and in practice. Fundamentally, this just isn't a case in which showing that Mr. Goldesberry was aware he'd done something wrong could advance the prosecution's cause. The defense did not deny that Mr. Goldesberry had committed the act alleged. Instead, Mr. Goldesberry consistently acknowledged that he had touched his daughter's vagina—something that's inherently shameful. The defense itself presented evidence and argument that Mr. Goldesberry, while maintaining that his conduct was a mistake, immediately apologized for it and felt guilty about what he had done. R. II:170, II:302-03, II:331-32, II:499. That the defense

33

*affirmatively wanted* the jury to hear that Mr. Goldesberry knew he had done something bad shows that, at the very least, this lent "equal or nearly equal circumstantial support to … a theory of innocence." *Lovern*, 590 F.3d at 1107.

Examining the particulars of the prosecution's consciousness-of-guilt argument only makes things worse for the government. First, the prosecution emphasized that Mr. Goldesberry did not tell anyone about the incident, including his wife. R. II:512, II:516. But the evidence showed that Mr. Goldesberry wanted to discuss what had happened with Mrs. Goldesberry, that K.G. implored him not to mention it to her because it was too embarrassing, and that Mr. Goldesberry acquiesced to K.G.'s wishes. R. II:176. There was no evidence to the contrary. Regardless, what Mr. Goldesberry did was plenty shameful if done by mistake, and the jails would be overrun if keeping something shameful from your spouse were taken as proof of a crime.

Second, the prosecution argued that Mr. Goldesberry effectively blamed K.G. for what happened by telling her that she should have woken him up to let him know she was getting into bed with him. R. II:487-88, II:493-94. But the evidence showed that, rather than blaming K.G., Mr. Goldesberry "apologized profusely" when he realized his mistake and, in the conversation that followed, focused on "making sure [K.G.] was okay." R. II:141, II:144, II:170, II:174, II:177. While it's true that Mr. Goldesberry at some point suggested that K.G. should have woken him up, K.G.'s testimony made clear that this was in the context of them discussing ways to make sure that something like this never happened again. R. II:175. Regardless, even if

the prosecution's characterization of the facts were true, that would do nothing to prove that Mr. Goldesberry acted with knowledge. Again, no one disputes that something bad happened that night, and it's entirely commonplace for people to react defensively after causing harm by mistake or accident. Anyone who has been involved in a car wreck can appreciate this.

Third, the prosecution posited that Mr. Goldesberry "revealed his consciousness of guilt" when he asked a CPS investigator whether touching just past the labia majora constitutes "penetration." R. II:494-95, II:516. To be clear, and contrary to the false picture that the prosecution sought to paint, this was not something that Mr. Goldesberry himself brought up. Instead, the evidence showed that *the CPS investigator asked Mr. Goldesberry* whether he penetrated K.G. with his finger, and Mr. Goldesberry (a medical professional) responded with (1) a precise description of what happened and (2) what amounted to a request for a clarification of the investigator's question. R. II:374-75. Regardless, neither the exchange that actually occurred nor the prosecution's misrepresentation of the interview does anything to suggest that Mr. Goldesberry knew he was reaching for K.G. rather than his wife two-to-three years earlier.

Finally, the prosecution maintained that Mr. Goldesberry displayed consciousness of guilt when he asked whether then-Officer Bartlett was there to speak to him as a friend or to investigate him for a crime. R. II:494-95, II:516. But consider the context: Mr. Goldesberry had just learned that he was under investigation. R. II:146-50, II:161-62, II:356, II:416-17. He knew that

he had, even if because of mistake or accident, committed the *actus reus* of a serious crime. He knew that the Bartletts—having reported the incident as sexual abuse despite K.G.'s insistence that it was accidental—seemed to have already concluded that he was guilty. R. II:190-92, II:222-23. And Mr. Bartlett, of course, was a law enforcement officer. R. II:219-20. Under the circumstances, Mr. Goldesberry's concern that then-Officer Bartlett might be there to elicit statements that could be used against him was perfectly understandable. And, in fact, that's precisely what then-Officer Bartlett *was* there to do. R. II:225 (describing how he tried to record the conversation with Mr. Goldesberry in the expectation that the recording could later be used at a criminal trial).

The prosecution's intimation that people suspected of a crime only need to fear being questioned by law enforcement if they are guilty (R. II:495) defies common sense—and it's anathema to the American constitutional ethic. *See Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (explaining that the right to remain silent serves "to protect *innocent* men" in that the "truthful responses of an innocent witness … may provide the government with incriminating evidence"). Indeed, the prosecution's own closing argument in this very case vindicates Mr. Goldesberry's evident worry that anything said about this regrettable mistake could be contorted into evidence of a crime. In short, Mr. Goldesberry's question to then-Officer Bartlett provides no support for an inference that he knew he was reaching for K.G. rather than Mrs. Goldesberry two-to-three years earlier.

* * *

In our constitutional system, this Court plays a critical role in ensuring that people aren't sent to prison except when their guilt has been established to a moral certainty. In this case, even when the evidence is considered in the light most favorable to the government, it fails to show beyond a reasonable doubt that Mr. Goldesberry knew he was engaging in a sexual act with K.G. Neither the *actus reus* of the incident, nor Mr. Goldesberry's behavior afterwards—nor those things considered cumulatively—would allow a factfinder to reasonably conclude that the prosecution proved Mr. Goldesberry's guilt beyond a reasonable doubt. Under Supreme Court precedent, this Court must intervene and reverse Mr. Goldesberry's conviction.

## II.    The Prosecution Committed Serious Misconduct During Closing.

If the Court does not reverse and direct a judgment of acquittal, it should order a new trial because the prosecutors committed misconduct during their closing arguments. Defense counsel failed to object, so review is for plain error. On plain-error review, vacatur is warranted if Mr. Goldesberry demonstrates that (1) the prosecution made one or more "plainly improper" comments and (2) the misconduct "affected his … substantial rights." *United States v. Farmer*, 770 F.3d 1363, 1370 (10th Cir. 2014). Mr. Goldesberry can make the required showings.

### A. Prosecutors made plainly improper comments—misstating key testimony, distorting the record, and attacking Mr. Goldesberry's character.

During closing, prosecutors presented at least four arguments that are plainly improper.

> **Improper Argument #1:** False proclamations that K.G. never testified that, during the incident, she heard snoring and saw Mr. Goldesberry's eyes were closed.

First, the prosecution misstated K.G.'s testimony about what she heard and saw during the 2017 incident.

During the defense's closing, Mr. Goldesberry's counsel maintained that he was half-asleep when he touched K.G.—citing, among other facts, that "[h]is eyes were closed" and "[h]e was snoring" when he was touching K.G. R. II:503-05. In rebuttal, the prosecution purported to "clear up" what it characterized as factual errors in the defense's closing. R. II:512. Across five paragraphs of argument, the prosecutor insisted that defense counsel was wrong to assert (1) that K.G. heard Mr. Goldesberry snoring at the moment she felt herself being touched and (2) that K.G. saw Mr. Goldesberry's eyes were closed when she turned to call out. R. II:512-13. The prosecutor did not just dispute that this *happened* but explicitly denied that K.G. had *testified* to it, asserting, "[T]hat is not what [K.G.] said on the stand." R. II:513.

The prosecution told the jury (1) that "[s]he did not testify that she heard him snoring when the—when the fingers were inside of her" and, similarly, (2) that K.G. "didn't testify" that she "saw his eyes were still closed" when she turned and called out. *Id*. According to the prosecution, defense

counsel had gotten the timeline mixed up: K.G. only ever testified that she heard Mr. Goldesberry snoring when she first came into the room and got into bed, before she fell asleep—not when she later awoke to being touched. R. II:512-13.

But all of this was false. In reality, the defense's argument had been accurate, and it's the prosecutor who unambiguously misstated the evidence. K.G. specifically testified that she heard Mr. Goldesberry snoring at the moment of the touching. In response to the question, "Could you hear anything when he was touching you?," K.G. answered, "Him snoring." R. II:140. And when asked to confirm whether she had "testified earlier that he was kind of snoring while he was touching you," K.G. answered, "Correct." R. II:168.

K.G. also specifically testified that, when she turned and reacted, she noticed that Mr. Goldesberry's eyes were closed. K.G. was asked, "When your dad was touching you and you turned around and said, 'Dad what are you doing,' is that when you saw his eyes were closed?," and she answered, "Yes." R. II:168. She also made clear that this was when she noticed Mr. Goldesberry's closed eyes when she testified that she "understood that it [the touching] was a mistake because I heard his snoring and I saw his eyes were closed." R. II:187.

Thus, the prosecution misstated the evidence when it insisted that K.G. had never testified that she heard Mr. Goldesberry snoring and saw that his eyes were closed at the time of the incident.

It's obviously misconduct for a prosecutor to misstate the evidence. Indeed, the principle that "[c]ounsel may not misstate the evidence" is among the "basic rules of final argument." *United States v. Gregory*, 54 F.4th 1183, 1211 (10th Cir. 2022); *see United States v. Hammers*, 942 F.3d 1001, 1014 (10th Cir. 2019). It's even more unacceptable when, as here, the prosecution misrepresents the evidence while at the same time falsely accusing defense counsel of misstating the facts. *See Hodge v. Hurley*, 426 F.3d 368, 380 (6th Cir. 2005). Accordingly, the prosecutor's false assertions regarding K.G.'s testimony were plainly improper.

> **Improper Argument #2: False assertion that K.G. "routinely" got into her parents' bed.**

The prosecution also misstated the evidence when it informed the jury that K.G. regularly climbed into her parents' bed in the middle of the night—i.e., that this was something she "had *routinely* done before." R. II:487 (emphasis added). In reality, two witnesses had spoken about K.G. getting into her parents' bed, and both explicitly testified that it was *not* a regular occurrence. When K.G. was asked whether getting into her parents' bed was "something that you did regularly," she answered, "No." R. II:173-74. Similarly, when Mrs. Goldesberry was asked whether K.G. would "regularly get in bed with you and your husband," she answered, "No." R. II:404. There was zero evidence to support the prosecution's assertion that K.G. routinely got into her parents' bed—an assertion that worked to undermine Mr. Goldesberry's contention that he had little reason to expect that his daughter

would be in bed beside him. Again, to misstate the record in this way is plainly improper. *See, e.g.*, *Hammers*, 942 F.3d at 1014.

### Improper Argument #3: Deceptive attack on Mr. Goldesberry's character.

The prosecution also launched a misleading and plainly improper attack on Mr. Goldesberry's character.

The prosecution made the following remarks in support of an argument that Mr. Goldesberry's "actions afterwards" prove "that he knew what he was doing and … didn't make a mistake":

> Once Meagan Bartlett made her report … , the Goldesberrys had a choice of what to do. … [T]he Goldesberrys could keep [K.G.] in the home and send the defendant away or keep the defendant in the home and send [K.G.] away while the investigation was ongoing.
>
> … And who did the Goldesberrys choose? They chose to send their daughter, who had just disclosed all the things that were going wrong in her life, the bullying, the body shaming, the death of her grandparents, the death of some of her pets, the fact that she was self-harming, the fact that she had woken up with her dad's fingers in her vagina.
>
> The girl that had just … disclosed all of that to them, they decided to send her away from home, the only home that she'd ever known, the home that she had taken her first steps in. And they sent her away.
>
> Her father was supposed to protect her. Instead, he penetrated her. He was supposed to shield her. Instead, he stuck his fingers inside her vagina. He made her feel like his actions were her fault, and then he sent her away from home so he could come back. "Dad, what are you doing?" We know what he was doing. He was abusing her.

41

R. II:492-94.

To start, these remarks distorted the record and amount to plain misconduct for that reason. *See United States v. Coulter*, 57 F.4th 1168, 1185 (10th Cir. 2023). When the investigation began, Mr. Goldesberry went to stay at a hotel so that K.G. could remain in the home—and he only gave up on this plan because the Goldesberrys could not afford to pay for an extended hotel stay. R. II:158, II:421. Further, K.G. was not expelled from her home: Mrs. Goldesberry *asked K.G.* what *she* wanted to do, and *K.G.* (then fourteen and on summer break) decided that she would rather spend a few weeks with her uncle and aunt than remain at the house in her father's absence. R. II:434-35, II:443. And it's not true that K.G. had "just disclosed" to her parents that she was being bullied and body-shamed and was suffering trauma and grief over the death of her grandparents and her cat. These were things that, well before May of 2020, her parents not only knew about but had her in therapy to address. R. II:182-83, II:317, II:407-09. In short, the prosecutor's invective against Mr. Goldesberry's 2020 conduct was such a distortion of the evidence as to constitute plain misconduct.

More importantly, the prosecutor's remarks are beyond the pale because they were an attack on Mr. Goldesberry's character. They invited the jury to conclude that Mr. Goldesberry's actions during the 2020 CPS investigation expose him as the type of person who would mistreat his own daughter when it served his purposes. And it is plainly improper for a prosecutor to encourage the jury to convict a defendant on the theory that he is a bad

person. *See Coulter*, 57 F.4th at 1185 (prosecutor may not "encourage the jury to base its decision on irrelevant considerations"); *United States v. Charley*, 1 F.4th 637, 651 (9th Cir. 2021) (character arguments improper); *United States v. Washington*, 962 F.3d 901, 907 (7th Cir. 2020) (same); *Washington v. Hofbauer*, 228 F.3d 689, 699-700 (6th Cir. 2000) (same). Here, the prosecution not only presented a character-based argument; it did so in language calculated to play on jurors' emotions and evoke retributive impulses—making the remarks even more improper. *Gregory*, 54 F.4th at 1211 ("appeal[s] to passion" improper).

Of course, the prosecution didn't come right out and say that the jury should convict Mr. Goldesberry because he's a bad person—or the type of person who would abuse his daughter. It didn't have to do so. The jury would have understood the remarks as an argument that Mr. Goldesberry is the kind of man who pursues his own interests even at the expense of harming his daughter—because that's the only way to make sense of what the prosecution was driving at. And the prosecution didn't have to spoon-feed the jury the unmistakable significance of its remarks for them to be plainly improper. *See United States v. Rios*, 611 F.2d 1335, 1342-43 (10th Cir. 1979) (circuitous "innuendo" suggesting defendant threatened witnesses constituted prosecutorial misconduct).

**Improper Argument #4:** **Baseless suggestions that Mr. Goldesberry is to blame for K.G.'s mental health problems.**

Finally, the prosecution engaged in plainly improper argument when it baselessly insinuated that K.G.'s mental health problems were Mr. Goldesberry's fault. At the beginning of its rebuttal closing argument, the prosecution remarked: "[T]he least that he could do, if this was truly a mistake, was not focus on keeping it quiet. The least he could do is not watch for years his child deteriorate in front of his eyes. Watch this child keep this a secret for him." R. II:512. The prosecution returned to this theme several minutes later, dismissing the defense's mistake theory by remarking, "If that's the case, why do you watch your child deteriorate?" R. II:516. In context, it's clear that the prosecution was (1) attributing K.G.'s mental health problems to the 2017 incident and (2) blaming Mr. Goldesberry's supposed insistence on secrecy for K.G. not getting better. These inflammatory remarks distorted the record in multiple ways and were thus plainly improper. *See Coulter*, 57 F.4th at 1185.

First, the record does not support the notion that K.G.'s anxiety, depression, or self-harming behavior were caused by the 2017 incident. To the contrary, the evidence disclosed that K.G. suffers from Bipolar Disorder—a genetic psychiatric condition that runs in her family. R. II:179, II:408-09. Further, K.G. testified that what had exacerbated her psychiatric symptoms was not the 2017 incident—which she'd always perceived as an accident that was embarrassing, not traumatizing—but, instead, being severely bullied in

school and being an eyewitness to the deaths of her beloved grandparents. R. II:144, II:178-84. There was no testimony ascribing any of K.G.'s psychiatric symptoms to the 2017 incident, and it was plainly improper for the prosecutor to present that diagnosis absent an evidentiary basis.

Second, the record provides no support for the prosecution's assertions that Mr. Goldesberry was "focused on keeping [the 2017 incident] quiet" or that he induced K.G. to "keep this a secret for him." To the contrary, K.G. testified that Mr. Goldesberry "was only interested in making sure I was okay," that "he wanted to tell" Mrs. Goldesberry about what had happened, that K.G. implored him not to do so because she was embarrassed, that she convinced Mr. Goldesberry to let the matter drop, that he never suggested that K.G. should keep what happened from anyone, and that it was only K.G. who "wanted to keep this private." R. II:176-77. This is what K.G. has said all along. R. II:402-03. And there was zero evidence to the contrary.

Third, it's false that Mr. Goldesberry sat on his hands and simply "watch[ed] for years [as] his child deteriorate[d]." The record shows that, when K.G. began to experience bullying, the Goldesberrys arranged for her to switch schools. R. II:178-79. And when K.G. started having psychiatric symptoms, they took her to see a therapist, kept her in therapy, and ultimately got her on psychiatric medication. R. II:182-84, II:317, II:407-09, II:418. The evidence also established that Mr. Goldesberry never suggested that K.G. should keep the 2017 incident from her therapist—and that K.G. felt comfortable confiding in her therapist. R. II:176, II:183-84.

"The cardinal rule of closing argument is that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence." *United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010). The prosecution plainly broke this rule when it blamed Mr. Goldesberry for K.G.'s psychiatric problems.

\* \* \*

In short, Mr. Goldesberry has shown that the prosecution made arguments that are plainly improper.

## B.    The prosecutorial misconduct affected Mr. Goldesberry's substantial rights.

Mr. Goldesberry can also show that the prosecution's improper remarks—both individually and cumulatively—affected his substantial rights. This is because, but for the prosecutorial misconduct, "there is a reasonable probability that … the result of the proceeding would have been different." *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022). First, assuming *arguendo* that the prosecution's case against Mr. Goldesberry was not constitutionally insufficient, it was nevertheless problematic enough that an acquittal was a real possibility. Second, the prosecutorial misconduct in this case had a strong inherent tendency to improperly influence the jury. Third, the district court did not give a curative instruction or otherwise convey to the jury that the prosecutors' remarks were improper.

### 1.     The trial evidence made acquittal a real possibility.

"[T]he fact that there was sufficient evidence to convict does not mean that the jury would have convicted absent the prosecutor's improper remarks." *United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007). Here, if the Court concludes that the evidence is constitutionally sufficient to sustain a conviction, it should nevertheless conclude that the jury might have acquitted absent the prosecutorial misconduct. The evidence in this case provided significant support for the defense's theory that Mr. Goldesberry touched K.G. because of mistake or accident—i.e., because he was only half-awake and mistook K.G. for his wife. *See supra* at 3-9, 29-31, 39. And the prosecution's case that Mr. Goldesberry acted with knowledge that K.G. was laying in Mrs. Goldesberry's place was deeply flawed. *See supra* at 31-45. Under the circumstances, virtually any nontrivial error related to the jury's decision on the *mens rea* element posed a serious risk of tipping the scales. Each of the prosecutions improper remarks fits the bill and, thus, should be deemed to have affected Mr. Goldesberry's substantial rights.

### 2.     The prosecutors' improper remarks had a strong tendency to exert a malign influence.

The character of the prosecutorial misconduct also weighs heavily in favor of finding prejudice.

The prosecution repeatedly twisted the evidence in ways that unfairly undermined the defense's case. Such "mischaracterization[s] of the record" during closing are "of concern given the weight with which jurors generally

view a prosecutor's remarks." *Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002). "The power and force of the government tend to impart" a "ring of authenticity" and "stamp of believability to what the prosecutor says." *United States v. Smith*, 814 F.3d 268, 275 (5th Cir. 2016). And a prosecutor's "misrepresentation of material evidence can have a significant impact on jury deliberations because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *United States v. Carter*, 236 F.3d 777, 785-86 (6th Cir. 2001). Thus, there's every reason to expect that the jurors trusted the prosecution when, for example, it assured them that the defense's argument that Mr. Goldesberry had been half-asleep was baseless because K.G. had never testified that she heard Mr. Goldesberry snoring or saw that his eyes were closed at the time of the incident.[8]

Additionally, the prosecutor engaged in an attack on Mr. Goldesberry's character—and that tactic is disallowed precisely because character

---

[8] Given the enormous trust that jurors place in prosecutors, it's immaterial that the prosecutor at one point told the jury, "Your memory of the testimony controls. So rely on your memory." R. II:512. What followed this seeming qualification were the prosecutor's repeated and categorical denials that K.G. gave the testimony she gave—denials expressed with complete confidence. R. II:513. The entire point of this was to make sure the jurors remembered K.G.'s testimony as the prosecutor wanted them to, and not as defense counsel had described the testimony. And the entire danger of a prosecutor misrepresenting the record in this way is that such misrepresentations will taint the jurors' memories. *See Le*, 311 F.3d at 1020; *Carter*, 236 F.3d at 786.

arguments "weigh too much with the jury" and "overpersuade them." *Old Chief v. United States*, 519 U.S. 172, 181 (1997). The prosecution maintained that the jury should find Mr. Goldesberry guilty due to his (supposed) subsequent bad act of ejecting K.G. from her home, and the prejudice stemming from this argument was magnified by other misleading remarks that portrayed Mr. Goldesberry as a bad person—e.g., the prosecution's claims that Mr. Goldesberry blamed K.G. for the 2017 incident, manipulated her into remaining silent, idly "watch[ed] for years [as] his child deteriorate[d] in front of his eyes," and, after he was "caught," became "very interested" to find out whether it even "counted" if he only touched past the labia majora. R. II:487-516. This damning depiction of Mr. Goldesberry as a person—presented by officials who jurors would have trusted as a highly reputable source—must have exerted a strong influence.

Further, and crucially, each of the prosecution's improper arguments went to the core factual dispute at trial. They were explicitly targeted at the *mens rea* element and specifically designed to sway the jury into concluding that Mr. Goldesberry touched K.G. knowingly, rather than because of mistake or accident.

In short, the prosecutorial misconduct was serious in terms of its inherent tendency to improperly affect the verdict in this case.

### 3.    The trial judge did not give a curative instruction.

"[E]ven in the absence of objections by defense counsel, a trial judge should be alert to deviations from proper argument and take prompt corrective action as appropriate." *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005). Here, however, the judge did not mitigate the prejudice by giving a curative instruction or otherwise conveying to the jury that the prosecutors' remarks were improper.

To be sure, the jury instructions did include—amongst all the other standard admonitions—the stock warning that "lawyers' statements and arguments are not evidence." R. II:522; *see* 10th Cir. Crim. Pattern Jury Instr. No. 1.06 (2021). But courts have repeatedly recognized that such boilerplate does not cure serious misconduct. *See, e.g.*, *Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122, 1132 (10th Cir. 2009) ("[T]he more improper the argument and the more prejudicial the circumstances, the more specific and timely must be the curative instruction."); *United States v. Acosta*, 924 F.3d 288, 308-09 (6th Cir. 2019) ("general instruction" that "statements by lawyers are not evidence" "was not sufficient" to remedy misconduct where instruction was given "along with all other routine instructions" and "was not given at the time of the improper comments"); *United States v. Davis*, 863 F.3d 894, 903 (D.C. Cir. 2017) ("Standard jury instructions, such as that statements and arguments of counsel are not evidence and that it is the jury's memory of the evidence that should control during deliberations have long been recognized

not to be a cure-all for such errors.") (citations, quotation marks, and altera-tion marks omitted); *United States v. Sanchez*, 659 F.3d 1252, 1258 (9th Cir. 2011) ("We have held that curative instructions fail to neutralize the harm of improper statements by a prosecutor when they do not mention the specific statements of the prosecutor and are not given immediately after the damage is done."); *Azubike*, 504 F.3d at 41-42 (recognizing that a generalized instruc-tion to the effect that counsel's arguments are not evidence may be insuffi-cient if the case was close and the misstatement goes to a central issue).

Further, the standard instruction that lawyers' arguments are not evi-dence was beside the point. The danger of the prosecution misstating K.G.'s testimony was not that the jury would take the prosecutor's remarks them-selves as evidence but that the prosecutor's remarks would taint the jury's recollection of what K.G. said. *See Le*, 311 F.3d at 1020; *Carter*, 236 F.3d at 786. And the danger of the prosecution attacking Mr. Goldesberry's character was not that the jury would treat the attack as evidence but that the argu-ment would induce the jury to misuse the evidence presented. In short, the standard instruction was not pertinent.

What was needed was an instruction that singled out the prosecution's improper remarks and directed the jury to disregard those specific remarks. *See Whittenburg*, 561 F.3d at 1131. None was given. And absent a curative instruction, there is a reasonable probability that the prosecution's improper remarks influenced the verdict.

\* \* \*

51

For the reasons above, the Court should conclude that the prosecutorial misconduct affected Mr. Goldesberry's substantial rights.

## C.     The prosecutorial misconduct undermines the fairness, integrity, and public reputation of judicial proceedings.

Under plain-error review, vacatur is only appropriate if an error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Starks*, 34 F.4th at 1157. This Court appears to have concluded that such serious effects are necessarily present where, as here, attorneys representing the United States government have engaged in clear misconduct that undermines confidence in the outcome of a criminal trial. *See Farmer*, 770 F.3d at 1370; *cf. Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906-11 (2018). Regardless, prosecutorial misconduct of the kind described above—particularly in cases where defendants have a strong case for acquittal—is grossly unfair, compromises the integrity of defendants' criminal trials, and risks eroding the public's faith in the federal criminal justice system. The errors demand correction.

## Conclusion

Because the evidence is insufficient, the Court should reverse and direct a judgment of acquittal. Alternatively, the Court should vacate Mr. Goldesberry's conviction due to prosecutorial misconduct and remand for a new trial.

## Statement Requesting Oral Argument

Counsel requests oral argument because it would assist the Court in resolving this challenging and important case.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

JOSH LEE
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
(303) 294-7002
josh.lee@fd.org
Counsel for Appellant

## Certificate of Compliance

I hereby certify that, to the best of my knowledge and belief, formed after a reasonable inquiry, this brief is proportionally spaced and contains 12,996 words and therefore complies with the applicable type-volume limitations.

JOSH LEE
Assistant Federal Public Defender