CASE NO. 23-5008

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff / Appellee,*

v.

RAYMOND LEE GOLDESBERRY
*Defendant / Appellant.*

On Appeal from the United States District Court
for the Northern District of Oklahoma

*The Honorable John Antoon, II*
*United States District Judge*
Case No. 21-CR-450-GKF

## RESPONSE BRIEF OF THE UNITED STATES

*Oral argument is not requested*
*There are no attachments to this brief*

Clinton J. Johnson
United States Attorney
Northern District of Oklahoma

Leena Alam, OBA # 19035
Assistant United States Attorney
110 West Seventh Street, Suite 300
Tulsa, Oklahoma 74119-1013
918.382.2700
leena.alam@usdoj.gov

*Attorneys for the United States of America*

October 11, 2023

# Table of Contents

Table of Authorities ........................................................................ iv

Statement of Prior or Related Appeals ........................................... 1

Introduction ..................................................................................... 1

Statement of Jurisdiction ................................................................ 4

Issues Presented for Appeal ........................................................... 4

Statement of the Case ..................................................................... 5

    In 2020, 14-year-old K.G. confided in a friend about her father's sexual abuse ............................................................................................ 5

    Based on the information from K.G., Faith, and Michelle, Meagan made a report to Child Protective Services ........................................... 8

    Goldesberry told his best friend that "he had messed up real bad" but wouldn't share details, asking if he was "speaking to Officer Nathan or brother Nathan" ............................................................................... 9

    During the investigation, the Goldesberrys sent K.G. to relatives an hour way so her father could live at home ....................................... 10

    Goldesberry's 2020 CPS interviews confirmed he remembered and could specifically describe what he had done to his daughter three to four years earlier ................................................................................... 12

    After a federal grand jury charged Goldesberry with aggravated sex abuse of a minor under 12, his lawyer talked to K.G., who changed her account ... 12

    The change in K.G.'s account led the government to offer Goldesberry a plea to a lesser offense, and to seek a superseding indictment adding that lesser offense ............................................................................... 15

At trial, K.G. minimized and discounted her father's conduct, but Meagan and Nathan Bartlett described the serious concerns that led them to contact CPS .................................................................................................. 16

An experienced forensic interviewer's expert testimony provided the jury with context about child abuse disclosures, and about K.G.'s behavior in that context .............................................................................................. 18

Investigators described their 2020 interactions with the Goldesberry family, who all confirmed the digital penetration had happened three or four years earlier ................................................................................................... 20

Michelle Goldesberry took the stand and adopted her husband's version of events ...................................................................................................... 21

The district court excluded the 404(b) evidence because the jury was likely to find it shocking ..................................................................................... 22

In closing arguments, the parties presented different memories of K.G.'s testimony ................................................................................................... 22

After the district court reminded the jury that the lawyers' arguments were not evidence and that they could rely on their life experience and common sense in evaluating the evidence, they convicted Goldesberry of the under-12 aggravated sexual abuse charge ......................................................... 24

Summary of the Argument .......................................................................... 25

Argument ..................................................................................................... 28

I. Sufficient evidence, and the reasonable inferences therefrom, supported the jury's verdict ................................................................................................ 28

   A. Record Reference .................................................................................. 28

   B. Standard of Review ............................................................................... 28
   C. Based on the evidence and reasonable inferences therefrom, taken in the light most favorable to the government, a reasonable jury could have found

ii

that Mr. Goldesberry knowingly engaged in a sexual act with his 11-year-old daughter ......................................................................................... 29

    1. The Bartletts' testimony supported the inference that Goldesberry knowingly molested his daughter .................................................... 30

    2. K.G.'s testimony and behavior was consistent with the disclosure process of a child abuse victim ....................................................... 34

    3. By convicting Goldesberry of Count One, the jury necessarily rejected K.G.'s changed account of when the molestation occurred, along with her insistence that her father was asleep ......................... 36

    4. Goldesberry's admissions during his CPS interview contradicted his claims that he was asleep or unaware of who was in the bed ........... 37

II. None of the prosecutors' alleged misconduct during closing argument affected Goldesberry's substantial rights ....................................................... 40

    A. Record Reference ................................................................................... 40

    B. Standard of Review ............................................................................... 40

    C. The prosecutors' closing arguments properly invited reasonable inferences from the evidence; to the extent they contained errors, they did not affect Goldesberry's substantial rights ................................................ 41

Conclusion ........................................................................................................ 48

Statement Regarding Oral Argument ........................................................... 48

Certificate of Compliance .............................................................................. 49

Certificate of Service ..................................................................................... 49

iii

# TABLE OF AUTHORITIES

## Federal Cases

*McGirt v. Oklahoma*, 140 S.Ct. 2453 (2020) ..................................................2, 12

*United States v. Banks*, 884 F.3d 998 (10th Cir. 2018) ................................30, 33

*United States v. Camick*, 796 F.3d 1206 (10th Cir. 2015) ................................. 30

*United States v. Garcia*, 74 F.4th 1073 (10th Cir. 2023) .............................28–29

*United States v. Jones*, 802 F. App'x 325 (10th Cir. 2020)............................... 30

*United States v. Kelley*, 461 F.3d 817 (6th Cir. 2006) ..................................34–35

*United States v. Kepler*, 74 F.4th 1292 (10th Cir. 2023)...............................41, 44

*United States v. King*, 632 F.3d 646 (10th Cir. 2011)....................................... 28

*United States v. Morrow*, 79 F.4th 1169 (10th Cir. 2023)............................40, 41

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009)............................30, 46

*United States v. Sorensen*, 801 F.3d 1217 (10th Cir. 2015)............................... 46

*United States v. Tennison*, 13 F.4th 1049 (10th Cir. 2021)............................... 29

## Federal Statutes, Rules, and Sentencing Guidelines

18 U.S.C. § 1153 ............................................................................................. 4

28 U.S.C. § 1291 ............................................................................................. 4

Fed. R. Crim. P. 11(c)(1)(C) ........................................................................ 14

Fed. R. Evid. 404(b) ..................................................................................... 22

Fed. R. Evid. 413 .......................................................................................... 13

Fed. R. Evid. 414 .......................................................................................... 13

iv

## Statement of Prior or Related Appeals

Goldesberry has filed no prior or related appeals.

## Introduction

In 2020, Child Protective Services began investigating Raymond Goldesberry after his then-14-year-old daughter, K.G., told a friend that years earlier, she had awoken to her father's fingers moving inside her vagina. (R. Vol. 2 at 144–147, 196, 354). The friend reported to CPS that K.G. also told her that sometimes Goldesberry would use vibrators and dildos, in addition to his fingers, to penetrate her genitals. (R. Vol. 1 at 17). She also reported that K.G. and Goldesberry's older daughter, Faith, had told her that Goldesberry had requested to see them naked, masturbated in front of them, and penetrated their genitals with fingers and sex toys. (*Id.*). Faith told the friend that Goldesberry had once shaved her genitals and that Faith had to text her mother to come make it stop. (*Id.*). During the subsequent CPS investigation, Goldesberry told the investigator, Brenna Gusman, that he "would occasionally help . . . [Faith] remove her tampons," and his family confirmed the friend's report about Goldesberry shaving Faith's genitals. (R. Vol. 1 at 15).

The Goldesberrys insisted that the tampon removal was "for purely medical

1

reasons" and that "the shaving was innocent assistance, and that Goldesberry never did it again after [his wife] told him it was inappropriate." (*Id.*). Likewise, Goldesberry insisted and had persuaded K.G. and his wife that the digital penetration while K.G. had been sleeping was an accident and that he had mistaken her for her mother. (R. Vol. 2 at 141–143; 432–33). During Ms. Gusman's 2020 investigation, the Goldesberrys all indicated the digital penetration incident had occurred three to four years earlier, when K.G. would have been 10 or 11 years old. (R. Vol. 2 at 380). Based on her investigation, Ms. Gusman found that the family needed services, and she recommended "trauma-informed therapy for [K.G.]" and a parent education group for her mother. (R. Vol. 2 at 364–65).

After the Supreme Court decided *McGirt v. Oklahoma*, 140 S.Ct. 2453 (2020), a federal grand jury charged Goldesberry, an Indian, with aggravated sexual abuse of a minor under 12 in Indian country. The government notified Goldesberry that it intended to present evidence of his conduct toward Faith during the same period charged in the indictment under Rule 404(b) to show his intent, lack of accident, and absence of mistake; however, it conceded that because the Goldesberrys all insisted "there was no sexual intent," and Faith was 14 at the time of the incidents, the evidence was not admissible under

2

either Rule 413 or 414. (R. Vol. 1 at 15–26; R. Vol. 2 at 336–37).

At a pretrial, the district court noted that, because K.G. was under 12 at the time of the charged penetration incident, Goldesberry faced a mandatory minimum of thirty years. Thereafter, Goldesberry's lawyer met with Goldesberry's wife and K.G., who signed an affidavit denying she had told her friend, among other things, that her father had "asked to see her naked," "used dildos and vibrators and put his fingers inside of [her] for years," or "got into bed with [her] on multiple occasions when [she] was naked." (R. Vol. 3 at 5; R. Vol. 2 at 121, 132–35). After meeting with her father's lawyer, K.G. also stated, for the first time, that she had been 12 during the charged penetration incident. (R. Vol. 2 at 152). The grand jury returned a superseding indictment adding an alternative charge for sexual abuse of a minor 12 or older. (R. Vol. 1 at 101–02).

The district court ultimately excluded the 404(b) evidence, concluding that it would be unduly prejudicial. (R. Vol. 2 at 485). At trial, the jury heard from the friend K.G. confided in; the friend's father, a campus police officer who was also Goldesberry's best friend; the forensic interviewer who had interviewed K.G. in 2020; and the CPS investigator to whom Goldesberry had admitted his conduct. They also heard from K.G. and her mother, both of

3

whom testified that K.G. was 12 at the time of the digital penetration and adopted Goldesberry's story that the digital penetration had been an accident. It convicted Goldesberry of aggravated sexual abuse of a minor under 12. (R. Vol. 1 at 147). Goldesberry now appeals, alleging that insufficient evidence showed that he acted knowingly when he penetrated his daughter's vagina with his fingers.

## Statement of Jurisdiction

A federal grand jury charged Raymond Lee Goldesberry, an Indian, with sexual abuse of a minor in Indian country; therefore, the district court had jurisdiction over the criminal case under 18 U.S.C. § 1153. After a jury convicted him, the district court entered judgment and Goldesberry appealed his conviction. This Court has jurisdiction over his appeal under 28 U.S.C. § 1291.

## Issues Presented for Appeal

1. Whether sufficient evidence supported Goldesberry's conviction for aggravated sexual abuse of a minor under the age of 12, where he admitted in 2020 that he had placed his finger inside his daughter's labia majora three or

four years earlier, but claimed he mistook her for her mother.

2.   Whether the prosecutors' remarks in closing were plainly improper, where they contained reasonable inferences from the evidence, or whether they affected Goldesberry's substantial rights, where the jury was repeatedly instructed that lawyers' arguments were not evidence and that if counsel's arguments conflicted with their recollection, their recollection controlled.

## Statement of the Case

### In 2020, 14-year-old K.G. confided in a friend about her father's sexual abuse.

In late May 2020, COVID had closed schools, and most people were home from work. (R. Vol. 2 at 105). K.G., a 14-year-old from Tulsa, went to Miami, Oklahoma, to spend time with Meagan Bartlett, a life-long family friend. (Id. at 190, 192). Meagan's father, Nathan Bartlett, had been best friends with K.G.'s father, Raymond Goldesberry, since high school. (*Id.* at 190, 220–21). Although the Bartletts had moved away from Tulsa when Meagan was a baby, the Bartletts traveled regularly to visit the Goldesberrys, seeing them a few times a month. (Id.). The Goldesberrys were "like [Meagan's] second parents." (*Id.* at 191). Meagan was closer in age to K.G.'s older sister Faith and spent more time with Faith when the girls were younger, "but as [K.G.] was going

through puberty," "[s]he needed as much support as she could get," "so [Meagan] spent more time with her." (*Id.*) Meagan saw [K.G.] as her "little sister." (*Id.*).

While the girls were in Miami in May 2020, they stayed with Meagan's grandparents, swimming in the pool, doing puzzles, and watching TV. (R. Vol. 2 at 192). K.G. and her sister Faith did not have the best relationship, so Meagan "was almost filling that role," talking and listening to K.G. (*Id.* at 145). K.G. "just kind of felt like [she] just wanted to unload all [her] stuff." She began "listing all of the things that [she] was embarrassed about or ha[d] made [her] sad and that ha[d] just been low points in [her] life." (*Id.*). K.G. began sharing things that made Meagan worried. (*Id.* at 192).

Among other things, K.G. told Meagan about a time several years before when she had crawled into her parents' bed. (R. Vol 2 at 137). As a kid, K.G. had regularly had nightmares, sometimes frequently, and at others less frequently. (*Id.* at 136). When she would wake up from nightmares, she "would crawl into [her] mom and dad's bed because [she] was scared." (*Id.*). During the night in question, she crawled into bed and only her dad was there. (*Id.* at 137). When she got into bed, K.G. thought her dad was asleep, because he was snoring. (*Id.*). Once she was safely in bed with him, she fell back to

6

sleep. (*Id*.).

Later, K.G. woke up because she "felt his hand where it shouldn't have been." (R. Vol 2 at 137). Her father's arm was draped across the top of K.G., and his hand was moving under her underwear, touching inside and outside her vagina. (*Id*. at 138–39). Freaked out, K.G. jumped up and said, "Dad, what are you doing?" (*Id*. at 141). Goldesberry told K.G. he thought she was her mother. (*Id*.). Goldesberry told K.G. that if she ever came into her parents' bed because she had a nightmare, she had to wake him up and tell him. (*Id* at 141, 363). After her father told her that she should have woken him up, K.G. was embarrassed and didn't want to tell her mom or sister, because she felt "like it should have been [her] responsibility to wake him up," blaming herself for what had happened. (*Id.* at 142–44).

Neither Goldesberry nor K.G. told anyone, not even K.G.'s counselor, about the incident for several years. (R. Vol. 2 at 143–44). But in 2020, K.G. told Meagan Bartlett, who "seemed very concerned, even though [K.G.] stated it was an accident." (*Id.* at 144–46). "She had started disclosing things to [Meagan] a day or two before [Meagan] took her home to her parents." (*Id.* at 193). Meagan "felt like there was more" to the story and that K.G. "didn't disclose everything." (R. Vol. 2 at 193). Meagan encouraged K.G. "to tell [her]

7

the rest of the story" and "to tell her mother." (*Id.* at 193, 210)

When they got back to Tulsa, K.G. went into a separate room with her mother, Michelle. (R. Vol. 2 at 193). At some point, K.G. and her mother went for a drive. (*Id.* at 194). When they got back, Michelle asked that Goldesberry go back into their bedroom with her and K.G., while Meagan remained in the living room with K.G.'s older sister Faith. (*Id.*). Eventually, Michelle came out and spoke with Meagan and Faith about her conversation with K.G. (*Id.* at 195). Faith and Michelle also talked about other topics that Meagan found concerning. (*Id.*). Meagan did not tell Faith any details about what K.G. had reported until Faith "opened up to [Meagan] and gave [Meagan] the same details that [K.G.] did." (R. Vol. 2 at 210). Based on the things Meagan learned that night, including Faith's statements and Michelle's statement about the conversation among Michelle, K.G., and Goldesberry, Meagan encouraged Michelle and Faith to go to the police. (R. Vol. 2 at 195, 216). She tried to get both girls to return to Miami with her that night, but K.G. declined. (*Id.*).

***Based on the information from K.G., Faith, and Michelle, Meagan made a report to Child Protective Services.***

The next day, Meagan went to her father's office in Miami and described

8

what had been told to her. (R. Vol. 2 at 195, 221, 223). At the time, her father,

Nathan Bartlett, worked for the campus police at NEO A&M and was a

mandatory reporter who was "duty-bound to report" suspected child abuse to

the authorities. (*Id.* at 219–20). Based on the "amount of details that [he]

heard," Mr. Bartlett thought "[t]hat it needed to be reported" "[b]ecause it fell

under the requirements of the law." (*Id.* at 222–23). Together, Mr. Bartlett and

Meagan called the DHS hotline and Meagan made a report to CPS. (*Id.* at 196,

222).

The report to DHS included that K.G. told Meagan that Goldesberry had

used vibrators, dildos, and his fingers to penetrate her genitals. (R. Vol. 1 at

17). Meagan reported that both K.G. and Faith told her that Goldesberry had

requested to see them naked, masturbated in front of them, and penetrated

their genitals with fingers and sex toys. (*Id.*). She reported that Faith talked

about a time Goldesberry had shaved her genitals and she had texted her

mother so she could stop him in the act. (*Id.*).

*Goldesberry told his best friend that "he had messed up real bad" but wouldn't*
*share details, asking if he was "speaking to Officer Nathan or brother Nathan."*

After CPS contacted the Goldsberrys, Meagan and Nathan Bartlett returned

to Tulsa with Faith, because her parents wanted her back home. (R. Vol. 2 at

223–24). Michelle told Nathan that Goldesberry wanted to talk to him, so Mr. Bartlett found him in in the detached garage. (*Id.* at 224–25).

When Mr. Bartlett opened the door, Goldesberry "was crying and said that he had messed up and messed up real bad." (*Id.* at 225). Through sobs, Goldesberry "stated he had messed up" but "wouldn't necessarily talk about what he had done." (*Id.* at 226). Mr. Bartlett tried to record the conversation, because "based on the details Meagan had given [him] and the way that [Goldesberry] was acting," "if he was going to confess something of that serious a nature, [Mr. Bartlett] wanted it on recording and not just [Mr. Bartlett] word." (*Id.*). Goldesberry asked Mr. Bartlett, to whom he had been like a brother for 26 years, "if he was speaking to Officer Nathan or brother Nathan." (*Id.* at 220–21; 226).

***During the investigation, the Goldesberrys sent K.G. to relatives an hour away so her father could live at home.***

On May 25, 2020, Brenna Gusman, an investigator with Child Protective Services, received a referral regarding allegations of abuse involving the Goldesberry family. (R. Vol. 2 at 354). She informed Michelle there was an investigation with allegations against the father, and that a forensic interview would need to be conducted, and in the meantime, Goldesberry and K.G. were

10

to have no contact. (*Id*. at 356).

The day after Ms. Gusman contacted the family, she watched a forensic interview of K.G. (*Id*. at 357). At the forensic interview, K.G. told the interviewer about her father putting his fingers in her vagina. (*Id.* at 154). K.G. said she couldn't remember how old she was at the time of the incident, saying that "it was one of the things [she] wanted to forget." (*Id*. at 154). After the forensic interview, Ms. Gusman informed Michelle "that there had been a disclosure of sexual abuse occurring, and that until the investigation [wa]s complete, [K.G.] and [Goldesberry] were to have no contact." (R. Vol. 2 at 357). Michelle seemed "more concerned regarding the timeline of the investigation," because she wanted her husband to come back home. (*Id*. at 357–58). The original plan was that Goldesberry would be leaving the home and staying in a hotel. (*Id.* at 359, 420). After two nights, Michelle called Ms. Gusman to ask if Goldesberry could come home and K.G. could leave instead. (*Id*. at 359). Michelle then sent K.G. to stay with an aunt and uncle in Chandler, Oklahoma, for about 30 days so Goldesberry could come back home. (*Id.* at 421).

***Goldesberry's 2020 CPS interviews confirmed he remembered and could specifically describe what he had done to his daughter three to four years earlier.***

During her investigation, Ms. Gusman interviewed Raymond, Michelle, and Faith Goldesberry. (R. Vol. 2 at 354, 358). When she asked Goldesberry about the incident with K.G., he remembered what he had done and provided specific details based on his own memory. (R. Vol. 2 at 361–62). (*Id.*) During Ms. Gusman's June 2020 interviews, the Goldesberrys all indicated the digital penetration had occurred three to four years earlier. (*Id.* at 380).

In June 2020, Deniece Ishem, a DHS child welfare facilitator, conducted a child safety meeting, in which she spoke with Goldesberry about the reported incident with K.G. (R. Vol. 2 at 329). Goldesberry confirmed that the incident occurred and said it had happened three to four years earlier. (*Id.*). At the time of the 2020 meeting, K.G. was 14,[1] meaning that K.G. was 10 or 11 when Goldesberry said the incident happened. (*Id.*).

***After a federal grand jury charged Goldesberry with aggravated sex abuse of a minor under 12, his lawyer talked to K.G., who changed her account.***

In 2021, after the Supreme Court decided *McGirt v. Oklahoma*, 140 S.Ct. 2453 (2020), a federal grand jury charged Goldesberry, an Indian, with aggravated sexual abuse of a minor under 12 in Indian country. (R. Vol. 1 at

---

[1] K.G. testified that she was born in September of 2005. (R. Vol. 2 at 117).

13). Before trial, the government notified Goldesberry that it intended to present evidence of his sexual conduct toward Faith during the same period charged in the indictment. (R. Vol. 1 at 15). Specifically, it described evidence that Goldesberry told Brenna Gusman that he "would occasionally help his other teenage daughter, [Faith], remove her tampons," and that Michelle and Faith would testify to the same conduct, but that it was for medical reasons. (*Id*.). The government also notified Goldesberry of evidence that "Michelle caught the defendant shaving [Faith's] genitals when [Faith] was a teenager" and that the Goldesberry family told Ms. Gusman about this incident during the 2020 DHS investigation. (*Id*. at 16). It noted that Ms. Gusman would testify that the Goldesberrys "said the shaving was innocent assistance, and that Goldesberry never did it again after Michelle told him it was inappropriate." (*Id.*). The notice indicated the evidence was "inextricably intertwined with the charge in" the indictment, but that it was also admissible under Rule 404(b)[2] to prove Goldesberry's knowledge, absence of mistake, or lack of accident. (*Id.*).

At the pretrial conference, the district court reserved ruling on the Rule

_____

[2] The government later explained that the evidence was not admissible under Rule 413 or 414 because Faith was 14 at the time, and "because the defendant and his family insist[] there was no sexual intent." (R. Vol. 2 at 336–37).

404(b) notice. (R. Vol. 2 at 7). The district court observed that because the child was not 12 years old at the time of the charged penetration incident, Goldesberry faced a sentence of not less than thirty years or life. (*Id.* at 9). The government noted that it had offered a Rule 11(c)(1)(C) plea that would allow Goldesberry to plead guilty to the lesser charge of abusive sexual contact with a minor in Indian country, removing the mandatory minimum and capping the government's imprisonment recommendation at 14 years (the high end of the anticipated guidelines range), and permitting Goldesberry to file departure and variance motions and request any term of imprisonment. (*Id.* at 11).

After the pretrial but before trial, Goldesberry's lawyer met with Michelle and K.G., prepared an affidavit for K.G., and texted K.G. when it was ready for her to sign. In the affidavit prepared by Goldesberry's lawyer, K.G. denied that she had told Meagan Bartlett that her father had sexually abused her "for years" and had given many specific details about that abuse. (R. Vol. 2 at 121, 132–35, R. Vol. 3 at 5–6). After meeting with Goldesberry's lawyer, K.G. affirmatively stated for the first time that she had been 12 when her father put his fingers inside her vagina. (R. Vol. 2 at 152). Goldesberry attached K.G.'s affidavit to a motion in limine seeking to prevent hearsay testimony about K.G.'s earlier statements to Meagan. (R. Vol. 1 at 32–40; R. Vol. 3 at 5–6).

14

*The change in K.G.'s account led the government to offer Goldesberry a plea to a lesser offense, and to seek a superseding indictment adding that lesser offense.*

After learning about the contact between Goldesberry's lawyer and K.G., the district court appointed guardian ad litem to represent K.G. (R. Vol. 2 at 74; Vol. 3 at 14). In response to the change in K.G.'s account, the grand jury returned a superseding indictment, (1) adding Count Two, charging sexual abuse of a minor in Indian country for any conduct after K.G.'s twelfth birthday, and (2) limiting the dates for the aggravated sexual abuse charge in Count One to dates before K.G.'s twelfth birthday. (R. Vol. 1 at 101; *See* R. Vol. 2 at 83).

On the morning of trial, the government noted that after learning of the change in K.G.'s account, it had made a final plea offer that would have allowed Goldesberry to plead to sexual abuse of a minor in Indian country (the over-12 offense) with an agreed term of no more than two years. (R. Vol. 2 at 83). It observed that, despite the change in K.G.'s account, if Goldesberry elected to go to trial, sufficient evidence would still support the under-12 aggravated-sexual-abuse offense charged in Count One, which carried a 30-year mandatory minimum. (*Id.*).

15

***At trial, K.G. minimized and discounted her father's conduct, but Meagan and Nathan Bartlett described the serious concerns that led them to contact CPS.***

At trial, K.G. testified about the time when she had awoken to find her father's fingers moving in her vagina. (R. Vol. 2 at 137–39). She repeatedly minimized the conduct, saying "Barely" when asked if Goldesberry's hand was "moving" under her underwear, and again when asked if he was touching the outside or inside of her vagina. (*Id.* at 138–39). She testified that when he was touching her, she heard "[h]im snoring, like, going in and out of sleep." (*Id*. at 140). She claimed that when she jumped up and said, "Dad, what are you doing?" she woke him up. (Id. at 141). K.G. testified that she did not tell her mom or sister after it happened, because she was embarrassed, and that she was embarrassed because she felt "like it should have been [her] responsibility to wake him up," and that she blamed herself. (*Id.* at 143–44). K.G. testified that she had told Meagan she was "cutting" herself. (Id. at 180, 183).

K.G. acknowledged that at the time of her forensic interview, she had not remembered exactly how old she was during the incident. (*Id.* at 152-56). She insisted that after her father's lawyer showed her pictures, and after prosecutors "mentioned that it was important that we know the time period because of the certain sentence," she remembered that she was 12. (*Id.*). K.G. acknowledged

16

that she loved her dad and wanted to protect him. (*Id.* at 152).

Meagan Bartlett testified about her relationship with the Goldesberry family, the disclosures K.G. made to her, and her report to CPS. (R. Vol. 2 at 189–216). Meagan did not testify about any of the other disclosures of sexual abuse that K.G. or Faith had made to her. However, on cross-examination, when asked if she had told Faith what K.G. had told her, Meagan responded, "Faith opened up to me. I did not give her any details until after she opened up to me and gave me the same details [K.G.] did." (*Id.* at 210).

Nathan Bartlett recounted Meagan's consultation and their decision to call CPS. (R. Vol. 2 at 221–23). He described his "extremely close" 26-year friendship with Goldesberry: "He was my best friend. Ray has always been there for me. There have been times where I've been despondent. The man has held me while I cried. There have been times when I've held him when he's cried. Our daughters grew up together." (*Id.* at 221). He testified that he and Goldesberry were no longer friends. (*Id.*). Mr. Bartlett described their encounter after the CPS report, with Goldesberry "crying and saying he had messed up and messed up real bad," and Mr. Bartlett trying to record the conversation in case Goldesberry "was going to confess something of that serious a nature." (*Id.* at 225).

17

*An experienced forensic interviewer's expert testimony provided the jury with
context about child abuse disclosures, and about K.G.'s behavior in that context.*

Kelsey Blevins, the forensic interviewer who interviewed K.G. in 2020,

testified about the "victimization and disclosure process of child abuse victims"

based on her educational background, training, and experience conducting

nearly a thousand forensic interviews. (R. Vol. 2 at 258–273). She explained

that children exhibit a wide variety of responses to abuse, based on factors such

as "fear, shame, guilt, having been threatened by the offender, not having a

supportive caregiver believe them when they do disclose." (*Id*. at 260). Ms.

Blevins testified that "the process of disclosure is an evolving process and not a

one-time event," involving several phases, including denial, tentative

disclosure, active disclosure, recantation, and reaffirmation. (*Id.* at 261). She

contrasted active disclosure, where a child is actively giving what they

remember, with tentative disclosure, "where the child's giving vague

information or pieces of information to test and see what the reaction is going

to be to their disclosure, to see if they're going to be supported or believed."

(*Id.* at 262). In tentative disclosure, if the recipient is not supportive or critical

or doesn't believe the child, "it may cause the child then to recant, which is

another phase of the process." (*Id.* at 263). When a child tentatively discloses

18

to a friend, "it may not have been their intention for anyone beyond that friends (*sic*) that they were telling to know about it." (*Id.*). Other characteristics of tentative disclosure include (1) "minimizing," by saying "It only happened one time," or "It's not that big of a deal," (2) "discounting," by saying it was an accident, or "it's not that big of a deal," or (3) "forgetting," by "saying they forget." (*Id.* at 264–66). Another is "empowerment," also called "superhero," where the child might make implausible but aspirational statements such as, "And then I punched him in the face and ran away." (*Id.* at 264).

Ms. Blevins explained that children sometimes delay disclosure, based on fear, shame, guilt, or threats, or because "they may not be aware or understand that what happened to them was abusive." (R. Vol. 2 at 265). Delayed disclosure is more common when the offender is someone the child knows and loves. (*Id.*). She explained that it is unrealistic to expect a child, or even an adult, to be able to identify the exact date on which abuse occurred, or remember every detail about the day, time, and place. (*Id.* at 266). Some children delay disclosure because "they may be aware of the family dynamics and how they are going to change if they do disclose"; they "might be concerned that they're going to be removed from their house by child welfare." (*Id.* at 268). Children "might be concerned they're going to be hurt or someone

else might be hurt as a result of their disclosure," or "might feel guilty for talking about it because they've been told by the offender, you know, 'Bad things will happen if you talk about it.'" (*Id.* at 268–69). Psychological effects of child abuse can include "self-harming and suicidal ideation." (*Id.* at 272).

During Ms. Blevins' 2020 interview, K.G. "disclosed that her father touched her on her vagina on her skin outside and inside her body." (*Id.* at 278). She was "protective of the alleged offender and a bit defensive," and "was exhibiting some of those characteristics of tentative disclosure, like minimizing and discounting." (*Id.*). During cross-examination, Ms. Blevins confirmed that K.G. had told her that "she would consider running away or pulling a knife on her dad if he tried anything like that." (*Id.* at 303). On redirect, she explained that statements like these were consistent with "empowerment" or "superhero" statements that she had described on direct. (*Id.* at 324).

***Investigators described their 2020 interactions with the Goldesberry family, who all confirmed the digital penetration had happened three or four years earlier.***

DHS employees Deniece Ishem and Brenna Gusman described their June 2020 interactions with the Goldesberry family, in which Goldesberry confirmed that the digital penetration had occurred and everyone in the family

20

indicated it had happened three to four years earlier. (*Id.* at 329, 380). Ms. Gusman testified extensively about her 2020 interview of Goldesberry, including that he was able to describe in detail his memory of the charged penetration incident and that he had asked if his conduct "counted as penetration." (*Id.* at 362). Based on her investigation, Ms. Gusman found that the Goldesberrys needed services. (*Id.* at 364–65).

### *Michelle Goldesberry took the stand and adopted her husband's version of events*

Michelle Goldesberry took the stand in her husband's defense. She claimed that the digital penetration had occurred "around the time that [K.G.] and [she] were the same heighth," (*sic*) and that her daughter Faith had sometimes mistaken her and K.G. for one another. (R. Vol. 2 at 414). Michelle testified that her bedroom had blackout curtains and "a thick mil black plastic that is stapled on the inside of the window frame because I work night shift and wanted to make sure my room was blacked out." (*Id.* at 403). She asserted that when the curtains were drawn and the lights were off, the room was completely dark. (*Id.*).

On cross-examination, Michelle admitted that she hadn't worked the night shift since 2010, seven years before the episode in question. (R. Vol. 2 at 420). She said that by the time K.G. was 12, she was taller than Michelle, but she

21

acknowledged that K.G. "was significantly shorter when she was 10." (*Id.* at 425–26). Michelle identified a photo of her with her daughters from July 2016, before K.G.'s 11th birthday, in which she acknowledged that her breasts were bigger than K.G.'s and K.G.'s stomach appeared bigger than hers. (R. Vol. 2 at 426–427). Michelle admitted that after learning K.G. had been self-harming and that Goldesberry had put his fingers in K.G.'s vagina, she arranged for K.G. to stay with family an hour away, so Goldesberry could come home. (R. Vol. 2 at 434–35). She also admitted that she allowed Goldesberry's defense attorney to text K.G. and write an affidavit for K.G., and that she transported K.G. to the attorney's office to sign that affidavit. (*Id.* at 440).

***The district court excluded the 404(b) evidence because the jury was likely to find it shocking.***

Before closing, the district court denied the government's 404(b) motion, concluding that the evidence from Brenna Gusman about Goldesberry admitting that he removed Faith's tampons and shaved her genitals was unduly prejudicial, because there was a "strong likelihood that jurors would find the conduct shocking." (R. Vol. 2 at 485).

***In closing arguments, the parties presented different memories of K.G.'s testimony.***

In closing, defense counsel noted that "the undisputed evidence is that, at

22

some point, [K.G.] awoke to her father's hand in her pants. His eyes were closed. He was snoring." (R. Vol. 2 at 503). In rebuttal, counsel for the government sought to "clear up quickly" the timeline. (R. Vol. 2 at 512). She began by emphasizing, "Your memory of the testimony controls. So rely on your memory." (*Id.*). She described defense counsel's recitation of events, then repeated, "your memory controls, but that is not what [K.G.] said on the stand." (*Id.*). First, she argued, "[Y]ou've heard defense counsel make a big deal about how pitch black it was in the room. So [K.G.] couldn't have turned around and seen that he was sleeping. And that's not what [K.G.] said. She said she got into bed with him." (*Id.* at 513). Counsel further recounted her recollection of K.G.'s testimony:

> She heard him snoring. She believed he was asleep. And she fell asleep. She woke up with her back to him, his hands inside her vagina, and she instantly reacted. She didn't testify that she turned around and looked at him to make sure he was sleeping. She did, as she said, what any sane person would do, and she reacted instantly with her back to him. She did not testify that she heard him snoring when the -- his fingers were inside of her. She woke up to the fingers and reacted. And when she reacted, the defendant was caught. [K.G.] had caught him. She had fallen asleep, and she had woken up while his fingers were moving inside of her.

(*Id.*). After asserting that there was "no testimony that he was asleep, fully asleep, when he penetrated" K.G., she clarified that Goldesberry

himself had "told Ms. Gusman that he rolled onto his stomach," that "he is the one that recalls putting his hands in [K.G.'s] underwear. [K.G.] doesn't remember that. [K.G.] was asleep. She was asleep for all of that. He is the one that remembers that." (R. Vol. 2 at 515).

***After the district court reminded the jury that the lawyers' arguments were not evidence and that they could rely on their life experience and common sense in evaluating the evidence, they convicted Goldesberry of the under-12 aggravated sexual abuse charge.***

In instructing the jury, the district court explained what constituted evidence, and reminded them that "[t]he lawyers' statements and arguments are not evidence. Their questions and objections are not evidence." (R. Vol. 1 at 128; R. Vol. 2 at 522). The court also instructed the jury that "an inference is a conclusion that reason and common sense may lead you to draw from the facts which have been proved." (*Id.* at 129, 523). It further explained that "[b]y permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case." (*Id.*).

After deliberations began, the jury sent out a note, that asked, "How much of our own common sense and life experiences can we use to

weigh when making our decision?" followed by the quote "knowingly."
(R. Vol. 2 at 539). With the agreement of both parties, the district court
responded, "you may rely on your life experience and common sense in
deciding issues of fact in accordance with the instructions on the law I
have given you." (*Id.*). The jury returned a verdict finding Goldesberry
guilty of "knowingly engaging in a sexual act with a minor under the age
of 12." (*Id.* at 541-42). A different judge conducted sentencing, imposing
the mandatory minimum 360-month sentence required by the statute of
conviction. (R. Vol. 1 at 164).

## Summary of the Argument

The evidence presented to the jury, and the reasonable inferences from that
evidence, drawn from the jury's common sense and life experience, taken in
the light most favorable to the government, was sufficient to support their
conclusion that Goldesberry knowingly sexually abused his daughter K.G.
Although Goldesberry insisted he had mistaken K.G. for his 37-year-old wife,
the jury heard sufficient circumstantial evidence to reject his claim. First, they
heard that neither Goldesberry nor K.G. spoke of the incident for years, even
to her mother or therapist, until she finally unburdened herself to a friend.

25

After hearing more details, the friend and her father, Goldesberry's best friend of 26 years, were concerned enough they nonetheless reported the matter to Child Protective Services. When CPS investigated in 2020, all of the Goldesberrys agreed that the incident had happened three to four years earlier, when K.G. would have been 10 or 11. But by the time of trial, after learning that the charged offense carried a 30-year mandatory minimum if it involved a child under 12, the Goldesberrys had changed their account, and K.G. insisted she had been 12. K.G. exhibited many characteristics an expert witness identified as typical of a tentative child abuse disclosure, including self-harm, delay, minimization, discounting, and recanting after being disbelieved or experiencing the consequences of disclosure. The jury heard K.G.'s testimony and had a first-hand opportunity to evaluate it in light of expert testimony about child abuse disclosures. They also heard that during the 2020 CPS investigation, Goldesberry described his clear and specific recollection of the charged incident, undermining his later claim to have done it while half-asleep or unknowing. Taken together, all of this evidence allowed the jury to infer, based on reason and common sense that Goldesberry had knowingly molested his daughter, and then persuaded her and his wife to believe and testify that he had done so accidently, to avoid negative consequences, both to Goldesberry

26

and to themselves. Goldesberry's heavy reliance on sentencing testimony does not help him: even if his wife and daughter still believe his story that he accidentally stuck his fingers in his child's vagina, the jury did not.

Nor did the prosecutors' alleged misstatements during closing, made with no defense objection, constitute misconduct that affected Goldesberry's substantial rights. Most of those comments fell within the reasonable latitude afforded prosecutors in drawing inferences from the evidence during closing arguments. And although counsel inaccurately recounted K.G.'s testimony, she did so after both she and the court repeatedly cautioned that the jury's recollection should control, and before the court reminded the jury that the lawyers' arguments were not evidence. In light of these warnings, and given that the jury itself heard K.G.'s testimony, Goldesberry cannot show that the inaccuracies affected his substantial rights.

## Argument

### I. Sufficient trial evidence, and the reasonable inferences therefrom, supported the jury's guilty verdict.

#### A. Record Reference

Goldesberry moved for a judgment of acquittal at the close of the government's evidence (R. Vol. 2 at 380) and later renewed that motion. (*Id.* at 447). The district court reserved ruling initially but denied the motion after the jury found Goldesberry guilty. (*Id.* at 384, 448, 497).

#### B. Standard of Review

This Court reviews *de novo* the denial of a judgment of acquittal for insufficient evidence. *United States v. Garcia*, 74 F.4th 1073, 1117 (10th Cir. 2023). However, the reviewing court still "owe[s] considerable deference to the jury's verdict." *United States v. King*, 632 F.3d 646, 650 (10th Cir. 2011) (internal quotation marks omitted). It neither weighs the evidence nor judges witness credibility, nor does it "question the jury's resolution of the evidence if it is reasonable." *Garcia* at 1117. This Court "ask[s] only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.*

28

"A judgment of acquittal is appropriate only if a finding of an element of a crime beyond a reasonable doubt could not have been based on evidence and inferences reasonably drawn from evidence or where the guilty verdict rested only on a series of inferences." *Id.* "Rather than examining the evidence in bits and pieces, [this Court] evaluate[s] the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021) (internal quotation marks omitted).

### C. Based on the evidence and reasonable inferences therefrom, taken in the light most favorable to the government, a reasonable jury could have found that Mr. Goldesberry knowingly engaged in a sexual act with his 11-year-old daughter.

Mr. Goldesberry did not dispute before the jury, and does not dispute on appeal, that he engaged in a sexual act with his sleeping child. Before the jury, he disputed K.G.'s age at the time of that act but does not raise that issue on appeal. Thus, the only question before this Court is whether the evidence before the jury, both direct and circumstantial, and the reasonable inferences from that evidence, taken in the light most favorable to the jury's verdict, could have allowed a reasonable jury to conclude that Goldesberry acted knowingly when he reached across his sleeping 10 or 11-year-old daughter's body, inserted his fingers in her vagina and began moving them around.

29

That Mr. Goldesberry denied having the requisite knowledge does not undermine the jury's verdict. "Because defendants will rarely admit [their criminal intent], intent 'is generally proven through circumstantial evidence.'" *See United States v. Jones*, 802 F. App'x 325, 328 (10th Cir. 2020) *quoting United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir. 2009). "Proving intent is often a difficult task; therefore, courts do not require the government to prove a smoking gun that explicitly reveals the contents of a defendant's mind." *United States v. Camick*, 796 F.3d 1206, 1220 (10th Cir. 2015) (internal quotation marks omitted). "Instead, intent may be proven via circumstantial evidence; in fact, it is rarely established by other means." *Id.*; *see also United States v. Banks*, 884 F.3d 998, 1018 (10th Cir. 2018) ("The government can, and ordinarily does, prove knowledge and intent through circumstantial evidence.").

### 1. *The Bartletts' testimony supported the inference that Goldesberry knowingly molested his daughter.*

Here, the jury heard ample circumstantial evidence allowing them to infer Goldesberry's knowledge. They heard that although the sexual abuse occurred years earlier, neither Goldesberry nor K.G. spoke of it again for several years, until she confided in longtime family friend Meagan Bartlett, during a heart-to-heart talk in which K.G. "just kind of felt like [she] wanted to unload all [her]

stuff." (R. Vol. 2 at 145). The jury heard that K.G. "started disclosing things" that made Meagan worried. (*Id.* at 192–93). Among those things was "the time in bed with [her] dad." Meagan was concerned enough that she encouraged K.G. to tell her mother. (*Id.*).

The jury heard evidence allowing them to infer that after K.G.'s disclosure to Meagan, her parents influenced her to recant and alter her account. The jury learned that when K.G. returned home and talked to her mom, Michelle invited Raymond back into their bedroom with her and K.G. (R. Vol. 2 at 194).

They also heard evidence suggesting that Faith corroborated K.G.'s accounts and provided even more concerning information that caused Meagan to go from merely encouraging K.G. to tell her mother to encouraging Michelle and Faith to call the police. Specifically, they learned that Michelle came out and discussed with Meagan and Faith what she had been talking to K.G. about. (*Id.*). Meagan did not give Faith any details of what K.G. had told her until Faith "opened up to [Meagan] and gave [her] the same details [K.G.] did." (*Id.*). Based on other things Meagan learned that night that worried her, she "encouraged them to go to the police." (*Id.*).

Although the jury did not hear the additional details about other incidents

31

of abuse that K.G. and Faith had told Meagan, they heard testimony allowing them to infer that more concerning details about Goldesberry's abuse had been disclosed to Meagan. The jury heard that the next day, Meagan went to her father, Nathan Bartlett, to describe what she had heard. (R. Vol. 2 at 221). Based on "the amount of details" Meagan told him, Mr. Bartlett—a police officer and mandatory child abuse reporter—thought that Goldesberry's actions needed to be reported. (*Id.* at 222). He did not want to report Goldesberry, who was his best friend, and he "didn't want to believe that something like that could have occurred," but he had to report the conduct "because it fell under the requirements of the law." (Id. at 222–23).

The jury heard testimony that would have allowed it to infer that Goldesberry knew he had abused K.G. knowingly and felt guilty about it. Mr. Bartlett testified that after the CPS report, he saw Goldesberry, who "was sobbing" and said he had "messed up real bad," but would not give details to Mr. Bartlett. (R. Vol. 2 at 225). The jury heard that Mr. Bartlett tried to record his conversation with Goldesberry because, based on how Goldesberry was acting and the details Meagan had given him, Mr. Bartlett thought there was a possibility Goldesberry would say something that needed to be recorded. (*Id.* at 226). Significantly, they heard that although Goldesberry did not tell Mr.

32

Bartlett anything about the allegations, he asked "if he was speaking to Officer Nathan or brother Nathan." (*Id.* at 226).

In sum, from Meagan and Nathan Bartlett's testimony, the jury learned that two close family friends, one a law enforcement officer and mandatory reporter, found the things K.G., Michelle, and Faith told Meagan so concerning that Meagan encouraged Michelle and Faith to go to the police, and that Nathan felt "duty-bound" to report them, despite his 26-year friendship with Goldesberry. Although neither Meagan nor Nathan could testify about hearsay statements from K.G. or Faith, the context of their testimony revealed that K.G. had disclosed things other than the episode in bed with her dad, that Faith "gave [Meagan] the same details" K.G. had, and that Faith and Michelle had talked about other topics that caused Meagan to escalate from advising  K.G. to tell her mother to encouraging Michelle and Faith to call the police. From Goldesberry's reaction and statements to Nathan, the jury could have inferred that Goldesberry knew of the wrongfulness of his conduct and did not want to discuss it with a law enforcement officer. *See Banks*, 884 F.3d at 1020 (jury could permissibly infer knowledge of drug conspiracy's scope and objective based on defendant's actions both during and after completed drug sales); *United States v. Kelley*, 461

33

F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every possible hypothesis except that of guilt.").

### 2. K.G.'s testimony and behavior was consistent with the disclosure process of a child abuse victim.

The jury also heard K.G.'s description of the events and was able to observe her appearance and demeanor. Although she acknowledged that she had awoken to find her father's fingers moving in her vagina, K.G. repeatedly minimized his conduct, saying "Barely" when asked if Goldesberry's hand was "moving" under her underwear, and again when asked if he was touching the outside or inside of her vagina. (R. Vol. 2 at 137–39). The jury heard that K.G. blamed herself, because, after her father told her that she should have woken him up, she felt "like it should have been her responsibility to wake him up." (*Id.* at 141–42, 144). K.G. also insisted "it was an accident" and repeatedly testified that she didn't remember or wanted to forget things and didn't have "the best memory." (*Id.* at 143, 153–54, 156–57). The jury learned that K.G. had engaged in self-harm, by cutting herself. (*Id.* at 180). They also heard that K.G. suffered direct consequences from her disclosure to Meagan: in the aftermath of the CPS report, K.G. had to stay with a relative an hour away

34

while her parents stayed together at home. (R. Vol. 2 at 359).

After K.G.'s testimony, the jury heard from Kelsey Blevins, who reinforced how consistent some of K.G.'s behaviors were with tentative disclosures of child abuse. They heard that children sometimes make a tentative disclosure, and when a recipient is not supportive, may recant. (R. Vol. 2 at 261–63). Ms. Blevins described other characteristics of tentative disclosure that K.G. displayed, such as self-harm, minimizing, discounting, forgetting, and empowerment. (*Id*. at 264, 278). She also explained that children often delay disclosure, particularly if the offender is someone the child knows and loves, or because they're aware of how family dynamics could change if they disclose. (*Id.* at 265, 268). They also heard that K.G. had told Ms. Blevins that if her dad "tried anything like that," she would "consider running away or pulling a knife on" him. They learned this was consistent with a characteristic of tentative disclosure called "empowerment" or "superhero," where a child makes "statements that are improbable, but … empowering" like, "And then I punched him in the face and I flew out the door." (*Id*. at 303, 324).

Viewing K.G.'s statements in light of Ms. Blevins's expert testimony, a reasonable jury could have concluded that K.G.'s 2020 disclosure to Meagan Bartlett was a delayed tentative disclosure consistent with abuse by a close

35

family member. They further could have inferred that when her parents reacted defensively rather than supportively, and K.G. realized that her disclosure might have adverse consequences like requiring her to move out of her home, she recanted, adopting her father's version of events. The jury could reasonably have understood K.G.'s attempts at minimization ("barely"), discounting ("it was an accident"), and empowerment (talking about "pulling a knife" on her father) as corroborating, rather than contradicting, her original disclosure.

### 3. By convicting Goldesberry of Count One, the jury necessarily rejected K.G.'s changed account of when the molestation occurred, along with her insistence that her father was asleep.

Throughout the trial, the jury heard that in 2020, all of the Goldesberrys had confirmed that the digital penetration incident happened "several years before" or "three to four years earlier." (R. Vol. 2 at 137, 329, 380). During her forensic interview, K.G. said that she did not remember how old she was at the time of the abuse. (*Id.* at 154). Because K.G. was born in September 2005, three or four years before May 2020, she would have been 10 or 11. (Id. at 329).

However, in 2021, after a pretrial conference where the district judge observed that Goldesberry faced a 30-year mandatory minimum because K.G. had been under 12 during the charged incident, K.G. changed her account.

(R. Vol. 2 at 9). After meeting with her father's defense attorney, K.G. testified that she had been 12 years old during the charged incident. (*Id.* at 152–53). At trial, K.G. admitted that she had concluded she was 12 after prosecutors "mentioned that it was important that we knew the time period because of the certain sentence." (*Id.* at 156-57).

The jury convicted Goldesberry of the aggravated sex abuse offense in Count One, which required it to find that K.G. was under the age of 12. (Vol. 1 at 136, 147). In doing so, the jury necessarily considered both versions of the story, as well as other witnesses' testimony relating to the other Goldesberrys' 2020 statements about timing, and rejected the new version. In rejecting K.G.'s altered account, a reasonable jury could have inferred that her testimony had been influenced by her concern for her father and her family situation, and that the same concern motivated K.G.'s insistence that her father had been asleep and had "made a mistake" when he inserted his finger into her vagina.

### 4.  *Goldesberry's admissions during his CPS interview contradicted his claims that he was asleep or unaware of who was in his bed.*

Perhaps most significantly, the jury heard that in Goldesberry's 2020 CPS interview, he made statements irreconcilable with his theory of the case. Both before the trial court and this Court, Goldesberry argued that no reasonable

37

jury could conclude that he behaved knowingly, because he was asleep when K.G. climbed into his bed, and half-asleep when he digitally penetrated her vagina, mistakenly believing he was trying to initiate sexual intercourse with his wife. But the jury heard that when Child Protective Services investigator Brenna Gusman interviewed Goldesberry in 2020, he "remember[ed] what he had done" and was able to recount the event, giving "specific details from his own memory." (R. Vol. 2 at 362). He told Ms. Gusman that "he rolled over on his stomach to stimulate," "reached past the shorts and panties," and "began to stimulate after his fingers were past the labia majora." (*Id.*). He used those precise words, asking Ms. Gusman "specifically if it was technically considered penetration if he only made it past the labia majora." (*Id.*). Based on Goldesberry's detailed recollection and specific description of his actions, the jury could have rejected his defense that he was half-asleep or semi-conscious at the time, leading him to mistake K.G. for her mother.

Goldesberry's insistence that he mistook his daughter for his 37-year-old wife was likewise undermined by contemporaneous photographs. His reliance on an October 2017 photo to show that K.G. and her mother "were of similar size and had the same hairstyle" is misplaced, because K.G. would have been older than 12 when that photo was taken. (Aplt. Br. at 4, 30 (citing

38

government's Exhibit 5)). By convicting Goldesberry of Count One, the jury necessarily rejected his defense that K.G. was over 12 in favor of the Goldesberrys' 2020 statements that the incident had happened at a time when K.G. would have been 10 or 11 years old. Photos from 2016 more aptly depict the differences between K.G. and Michelle's stature, size, and physical maturity—as Michelle reluctantly acknowledged on cross-examination—at the time of the offense of conviction and undermine Goldesberry's contention that he could have mistaken one for the other, even in the dark. A reasonable jury could have inferred that Goldesberry, when taking the actions he was able to remember precisely and describe three to four years later, would have been able to distinguish between his 37-year-old wife and his 10 or 11-year-old daughter.

Goldesberry's outsized emphasis on sentencing testimony does not alter the analysis. (Aplt. Br. at 15–19). That Goldesberry, his wife, and daughters continued to minimize and discount the seriousness of his conduct at sentencing has no bearing on the sufficiency of the evidence at trial. It is immaterial that Goldesberry's wife, whose concern throughout the child abuse investigation was when her husband would be able to come home, and his victim, who blamed herself because her father told her she should have

awakened him, may have believed Goldesberry's story that he accidentally stuck his fingers in his 11-year-old daughter's vagina. The jury did not. And based on the totality of evidence before it, and inferences from that evidence based in reason and common sense, its conclusion was reasonable.

## II. None of the prosecutors' alleged misconduct during closing argument affected Goldesberry's substantial rights.

### A. Record Reference

Goldesberry's counsel did not object to any of the allegedly improper statements at trial.

### B. Standard of Review

"When a defendant fails to object to an allegedly improper statement during trial, [this Court] review[s] only for plain error." *United States v. Morrow*, 79 F.4th 1169, 1184 (10th Cir. 2023). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. "An error affects substantial rights when it prejudices the defendant by likely affecting the outcome of the proceedings"; the defendant "bears the burden of persuasion with respect to prejudice." *Id.*

### C. The prosecutors' closing arguments properly invited reasonable inferences from the evidence; to the extent they contained errors, they did not affect Goldesberry's substantial rights.

This Court "analyzes whether a statement constitutes prosecutorial misconduct using a two-step process," first determining "(1) whether the prosecutor's statements were improper and, (2) in the case of an improper statement, whether the impropriety was 'harmless' because it did not prejudice the defendant." *Morrow* at 1184. "Although a prosecutor may comment on and draw reasonable inferences from evidence presented at trial, arguing *prejudicial* facts not in evidence is one type of prosecutorial misconduct." *Id.* (emphasis in the original). The government is, however, "entitled to a reasonable amount of latitude in drawing inferences from the evidence during closing arguments." *United States v. Kepler*, 74 F.4th 1292 (10th Cir. 2023).

Here, counsel's comment on the Goldesberrys' choice to send K.G. to stay with relatives an hour away for thirty days so that Goldesberry could come home during the DHS investigation was not a deceptive attack on Goldesberry's character, but a reasonable inference from the evidence. Although Michelle claimed that they moved K.G. because they couldn't afford a hotel and that K.G. asked to stay with her aunt and uncle in Chandler, her own testimony and that of other witnesses supported the government's

41

argument that the Goldesberrys prioritized his needs over those of K.G. Specifically, Michelle acknowledged that she had sent K.G. "away after she told [Michelle] within the same week that she'd been cutting and that her father had put his fingers inside her vagina." (R. Vol. 2 at 434). Brenna Gusman, the CPS investigator, noted that her "biggest takeaway from the interaction" was that the Goldesberrys "were more concerned about the timeline of investigation," not because Michelle was concerned for K.G., but so "her family wouldn't be apart," because she wanted Goldesberry to come back home. (*Id.* at 357). Under these circumstances, counsel for the government drew a reasonable inference that the choice to move K.G. an hour away was made by the Goldesberrys, not their 14-year-old daughter.

The relevance of Michelle sending K.G. away was not that Goldesberry had a cold or uncaring character toward his daughter. The relevance was, rather, that it supported the inference that K.G. recanted her original disclosure and altered key facts to support her father's account after she experienced the negative consequence of being sent away. The evidence also showed the family's bias by showing their unflinching support of Goldesberry and their preference for Goldesberry's innocent explanation of the incident. The government was justified in highlighting facts demonstrating that bias.

Similarly, counsel's comments attributing K.G.'s mental health issues to the alleged sexual abuse by her father were based upon a reasonable inference from the evidence. Although K.G. and her parents tried to attribute her struggles to other causes, no testimony suggested that her mental health problems, diagnoses, or need for therapy predated the incident in which her father allegedly inserted his fingers into her vagina while she was sleeping, three or four years before she told anyone about the incident. Notably, although K.G. testified that she began seeing a therapist "for years before any of this came up" and for bullying and the loss of her grandparents, she clarified that the therapy began "before [the abuse] came into discussion." (R. Vol. 2 at 182). Likewise, she did not deny that she was cutting herself at the time, only that it "was before anyone knew about the cutting." (*Id.*). K.G.'s testimony thus supported the inference that her mental health issues arose after and as a result of the sexual abuse that she kept secret until finally unburdening to Meagan, even if her family was not yet aware of the source of those issues.

Likewise, although K.G. testified that she didn't tell her mother about the incident because she was embarrassed, she also explained that she was embarrassed because blamed herself, because she felt like "it should have been [her] responsibility to wake him up," because "he told [her] that [she] should

43

have woke him up." (R. Vol. 2 at 142). Taken together, those statements

supported counsel's invitation for the jury to draw the reasonable inference

that Goldesberry induced K.G. to keep the incident a secret for him, even if he

never explicitly told her to do so. *See Kepler* at 1320 ("[I]n context, the

prosecutor was asking the jury to draw the reasonable inference that Mr. Lake

did not have a gun from the absence of evidence. . ..."). Because the evidence

supported the inferences that the Goldesberrys sent K.G. away to allow her

father to come home, that her mental health struggles were related to the

undisclosed sexual abuse, and that Goldesberry induced K.G. to keep the

incident a secret, Goldesberry cannot show that "the prosecutor's comments

were plainly improper." *Id.*

Likewise, counsel's statement that K.G. "routinely" went to her parent's

room after having a nightmare arguably fell within the "reasonable amount of

latitude" afforded the Government in "drawing inferences from the evidence

during closing arguments." *Kepler*, 74 F.4th at 1316. K.G. had testified that she

had nightmares as a child and would crawl into her parents' bed, and that the

nightmares "just kind of happened when they did. There were times whenever

they were bad, and there were times whenever I barely had any." (R. Vol. 2 at

136). Although K.G. went on to suggest that "around that time" of the

44

incident she "didn't have many," her definition of "that time" was based on her new recollection that the incident took place "around the later portion of 2017," after she had turned 12. (*Id.*).  Even on cross-examination, she testified that she had crawled into her parents' bed "more than one time," "several times collectively over the years." And although both K.G. and Michelle testified she didn't do it "regularly," given their protectiveness toward Goldesberry, the latitude afforded the Government in closing allowed the inference that K.G. crawled into her parents' bed "routinely" when she had a nightmare, when she was younger than 12.

In contrast, counsel's statements that K.G. "did not testify that she heard him snoring when the – his fingers were inside of her" and that she "didn't testify that she turned around and looked at him to make sure she was sleeping" inaccurately recounted K.G.'s testimony. K.G. testified that when her father was touching her, she could hear "deep snoring" (R. Vol. 2 at 140). And on cross-examination, she answered "yes" when asked if when she "turned around and said 'Dad, what are you doing,' is that when you saw that his eyes were closed?" (*Id.* at 168). Counsel's characterizations of K.G.'s testimony on these points were erroneous. However, even where a prosecutor makes an erroneous statement in closing argument, and the defense interposes

45

a timely objection, any prejudice can be cured by an instruction that reminds the jury that its collective memory controls. *United States v. Sorensen*, 801 F.3d 1217, 1242 (10th Cir. 2015).

In *Sorenson*, the prosecutor made multiple misstatements of fact during closing argument, some preserved for review by a defense objection, and others reviewed for plain error. 801 F.3d at 1242. This Court found that even the preserved misstatement was not prejudicial because the judge instructed the jury "to the extent that your collective memory disagrees with that of any lawyer, rely on your collective memory." *Id*. Likewise, the Court found that an unpreserved "misstatement did not affect Sorenson's substantial rights" where "the district court instructed the jury that the lawyer's statements and arguments are not evidence." *Id. citing United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009) (prosecutor's improper remarks in closing argument did not affect defendant's substantial rights, in part because the district court had instructed the jury that closing arguments are not evidence).

Here, Goldesberry did not object to any of the alleged misstatements at trial, and the district court gave both types of instructions the *Sorenson* court identified as preventing prejudice from improper closing remarks. It instructed the jury, "If any reference by the Court or counsel to the witness' testimony

46

conflicts with your own recollection, it is your own recollection that should control during your deliberations and not the statement of Court or counsel." (R. Vol. 2 at 96). Later, it instructed them that the "the lawyers' statements and arguments are not evidence." (R. Vol. 2 at 475). Significantly, before making the challenged statements, counsel for the government told the jury, "Your memory of the testimony controls. So rely on your memory." (R. Vol. 2 at 512). And before arguing that "that is not what [K.G.] said on the stand," she reminded them, "As I said, your memory controls…." (*Id.* at 513). These cautionary statements, from both the court and counsel, amply prevented against prejudice from counsel's errors. In addition to the erroneous statements, the jury heard K.G.'s repeated testimony, on both direct and cross-examination, that her father was snoring when he was touching her. (R. Vol. 2 at 140, 141, 168, 170, 187). They also heard defense counsel's statement that "[h]e was snoring. [K.G.] has never said anything different than that," and "she turned around and looked at her dad and saw that his eyes were still closed." (*Id.* at 503). Given that the jury itself heard K.G.'s testimony, was cautioned that the lawyers' arguments were not evidence, and was repeatedly reminded that their recollection controlled, Goldesberry cannot show that the two erroneous statements in the government's argument affected his

47

substantial rights.

## Conclusion

For all the reasons set forth above, this Court should affirm Goldesberry's

conviction.

## Statement Regarding Oral Argument

The United States does not request oral argument.

<div style="margin-left: 40%;">

Respectfully submitted,
CLINTON J. JOHNSON
United States Attorney

 */s/ Leena Alam*
Leena Alam, OBA # 19035
Assistant United States Attorney
110 West Seventh Street, Suite 300
Tulsa, Oklahoma 74119-1013
918.382.2700
leena.alam@usdoj.gov

</div>

## Certificate of Compliance with Type-Volume Limit

This document complies with the type-volume limit of Fed. R. App. P. 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,540 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT.

*/s/ Leena Alam*
Leena Alam
Assistant United States Attorney

## Certificate of Service

I certify that on October 11, 2023, I electronically transmitted the foregoing to the Clerk of the Court using the ECF System for filing, which will send notification of that filing to the following ECF registrant:

Josh Lee (Josh_R_Lee@fd.org)
Counsel for Defendant/Appellant

*/s/ William Foreman*
William Foreman
Paralegal Specialist