**Case No. 23-5008**

---

In the United States Court of Appeals
for the Tenth Circuit

---

**United States of America**,
Plaintiff-Appellee,

v.

**Raymond Goldesberry**,
Defendant-Appellant.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
The Honorable Judge John Antoon, II
D.C. Case No. 4:21-cr-00450

---

**Appellant's Reply Brief**

---

Office of the Federal Public Defender        Virginia L. Grady
633 17th Street, Suite 1000                  Federal Public Defender
Denver, Colorado 80202
Tel: (303) 294-7002                          Josh Lee
Fax: (303) 294-1192                          Assistant Federal Public Defender
                                             josh.lee@fd.org

                                             Counsel for Raymond Goldesberry

Oral argument is requested.

November 8, 2023

# Table of Contents

**Page**

Table of Authorities ................................................................. iii

Reply Argument ....................................................................... 1

I.    The Evidence of *Mens Rea* Was Insufficient ............................ 1

    A.    Mr. Goldesberry's conviction can't be upheld based on bogus hearsay accusations the jury never heard. ......................... 2

        i.    The Court should disregard the answer brief's discussion of hearsay allegations outside the trial record. .................................................................... 2

        ii.    The answer brief's attempt to backdoor the extra-record allegations should be rejected. ................................. 4

        iii.   K.G. invariably said this was a single, accidental occurrence, and she never "recanted" anything. ............. 10

    B.    The government's other sufficiency arguments are meritless. ...................................................................... 13

II.   The Prosecution's Plain Misconduct Warrants a New Trial. ............... 19

    A.    Mr. Goldesberry was prejudiced by remarks the government admits were plainly improper. ............................. 19

    B.    The other prosecutorial remarks challenged by Mr. Goldesberry were plainly improper. ............................. 22

        i.    Improperly arguing character. ............................. 22

        ii.   Falsely saying that K.G. routinely got into her parents' bed. ................................................. 23

i

    iii.    Baselessly blaming Mr. Goldesberry for K.G.'s
          mental health problems.........................................................24

Certificate of Compliance .......................................................................26

# Table of Authorities

**Page**

**Cases**

*Matthews v. Workman*,
  577 F.3d 1175 (10th Cir. 2009) ..............................................................3

*United States v. Caraway*,
  534 F.3d 1290 (10th Cir. 2008) ............................................................10

*United States v. Christy*,
  916 F.3d 814 (10th Cir. 2019) ...................................................... 5, 7, 17

*United States v. Lovern*,
  590 F.3d 1095 (10th Cir. 2009) .......................................................1, 16

*United States v. Ragghianti*,
  560 F.2d 1376 (9th Cir. 1977) ...............................................................24

*United States v. Rogers*,
  556 F.3d 1130 (10th Cir. 2009) ............................................................21

*United States v. Sorensen*,
  801 F.3d 1217 (10th Cir. 2015) ............................................................21

*United States v. Summers*,
  414 F.3d 1287 (10th Cir. 2005) ..........................................................6, 7

**Statutes**

18 U.S.C. § 3731 ....................................................................................4

**Rules**

Fed. R. Evid. 801 ...................................................................................8

Fed. R. Evid. 802 ...................................................................................8

## Reply Argument

### I.    The Evidence of *Mens Rea* Was Insufficient.

In Mr. Goldesberry's opening brief (at 3-14, 29-37), he canvassed the trial evidence and demonstrated that it is at least as consistent with innocence as it is with guilt. Specifically, the facts lent just as much circumstantial support to the defense's hypothesis that Mr. Goldesberry mistakenly believed it was his wife lying next to him in the marital bed as they did to the prosecution's hypothesis that he knew that K.G. had laid down in his wife's place overnight. Under settled law, this renders the evidence of Mr. Goldesberry's mental state legally insufficient. *See United States v. Lovern*, 590 F.3d 1095, 1107 (10th Cir. 2009) (holding that, where "the evidence gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [the Court] must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt").

In response, the government offers a damning story in which K.G. initially disclosed that Mr. Goldesberry had subjected her to a pattern of egregious sexual abuse but then, under pressure from her parents, recanted and started saying that the only thing that ever happened was this one accidental touching in bed. If the trial evidence bore this out, that would surely doom Mr. Goldesberry's appeal. But the government's story has no support in the case it presented to the jury. Instead, it's sheer speculation that derives, not from anything in the trial record, but from false hearsay allegations that the jury never heard.

1

### A.  Mr. Goldesberry's conviction can't be upheld based on bogus hearsay accusations the jury never heard.

The government's primary argument for upholding Mr. Goldesberry's conviction is that we can validly infer that he knowingly touched K.G. on the night in question from the proposition that he sexually assaulted both K.G. and her sister on other occasions. This theory—which was never argued to the jury—fails for the rather obvious reason that the jury never heard any evidence that Mr. Goldesberry engaged in any other act of sexual abuse.

### i.  The Court should disregard the answer brief's discussion of hearsay allegations outside the trial record.

The answer brief leads with (at 1-3) and otherwise emphasizes and refers to (at 9, 14, 17, 31-33) accusations that Mr. Goldesberry committed acts of sexual abuse other than the one charged. However, these accusations were dubious hearsay that—critically—the jury never heard. Because they form no part of the trial evidence, the hearsay accusations are not pertinent to the sufficiency question, have no valid place in this appeal, and should be disregarded.

During pretrial proceedings, the government represented that one of its witnesses, Meagan Bartlett, was claiming that she had heard from K.G. and her sister, Faith Goldesberry, that Mr. Goldesberry had sexually abused them by doing things like penetrating them with sex toys and masturbating in front of them. *See* R. I:17. Apparently, Ms. Bartlett was claiming that the Goldesberry sisters told her they had been subjected to such egregious sexual abuse for years. *See* R.I:33-34. When K.G. and her sister learned that Ms.

Bartlett was claiming they told her such things, however, they specifically and repeatedly insisted that this was false. *See* R. I:36, II:90. And the investigation conducted by Child Protective Services (CPS) evidently concluded that Ms. Bartlett's lurid allegations about years' worth of pervasive abuse involving sex toys and masturbation were bogus. *See* Opening Br. at 7.

Before trial, defense counsel moved to exclude Ms. Bartlett's false accusations as unreliable hearsay. R. I:32-37. The government did not disagree that Ms. Bartlett's claims were inadmissible hearsay and promised not to elicit them at trial. R. I:113-14, II:56, II:90-92. Accordingly, Ms. Bartlett never testified that she had heard that Mr. Goldesberry had committed other acts of sexual abuse. R. II:189-217. Instead, the only trial evidence of what Ms. Bartlett was told came from K.G. herself, who testified that she told Ms. Bartlett precisely what she was telling the jury: that her father touched her one time in bed and that it was an accident. R. II:145-46. Thus, the jury — for good reason — never heard Ms. Bartlett's accusations that Mr. Goldesberry engaged in other acts of sexual abuse.

This means there's no legitimate reason for the answer brief to discuss those accusations. It should go without saying that sufficiency-of-the-evidence claims are adjudicated based on the evidence presented at trial. Extrinsic allegations that the jury never heard have no bearing and must be disregarded. *See, e.g.*, *Matthews v. Workman*, 577 F.3d 1175, 1185 (10th Cir. 2009) ("[I]t makes no sense for us, in reviewing whether a jury's verdict was

based on sufficient evidence, to consider facts the jury never heard."). Accordingly, the Court should ignore those passages of the answer brief that discuss such matters.[1]

> ### ii.    The answer brief's attempt to backdoor the extra-record allegations should be rejected.

Superficially, the answer brief's argument section acknowledges that the jury never heard Ms. Bartlett's hearsay accusations that Mr. Goldesberry had engaged in other acts of sexual abuse. In effect, however, the government (at 30-33) tries to smuggle those accusations into the sufficiency analysis through the back door.

The government argues that, although Ms. Bartlett never testified to what she was told by K.G. or her sister, Ms. Bartlett and her father did testify to how they reacted to what she heard: they expressed deep concern and did things like report Mr. Goldesberry to CPS, encourage his wife to go to the police, and attempt to record a conversation with him in the anticipation of

---

[1] The Court should also disregard passages of the answer brief (at 1-3, 13, 22) that emphasize—and distort—other incidents that the jury never heard about. Supposedly, when Mr. Goldesberry's older daughter, Faith, got a tampon stuck for a full day and couldn't remove it herself, she asked her father for help, and Mr. Goldesberry (a medical professional) put on gloves and assisted her. *See* R. I:43-52. On another occasion, Faith, while wearing a bathing suit, supposedly solicited and received Mr. Goldesberry's help with shaving her bikini line. *Id*. The judge excluded these incidents as irrelevant and, in the alternative, as more prejudicial than probative. R. II:485. The government could have appealed this ruling, 18 U.S.C. § 3731, but it chose not to. As a result, the irrelevant tampon and shaving incidents were not presented to the jury, and they have no legitimate bearing on this appeal.

future criminal proceedings. According to the government, these reactions prove that Ms. Bartlett heard about other instances of sexual abuse, which in turn proves that Mr. Goldesberry acted knowingly when he touched K.G. during the incident charged.

The government's theory must be rejected for at least two reasons: (1) it contravenes the rule against piling inference upon inference and (2) it's an improper attempt to circumvent the rule against hearsay.

**First,** when properly assessed only in light of what the jury heard, the government's theory is so speculative that it helps demonstrate why Mr. Goldesberry's conviction must be reversed. Recall that the jury was only presented with one report of what Ms. Bartlett was told—that of K.G.—who testified that she told Ms. Bartlett about an embarrassing incident in which her father accidentally touched her on one occasion in bed. R. II:145-46. The notion that the Bartletts' conduct in the wake of K.G.'s disclosure shows that Ms. Bartlett was actually told something profoundly different—and, further, something so specific that it establishes the *mens rea* of the particular offense charged—is way too much of a stretch to support Mr. Goldesberry's conviction.

This Court has long recognized that "[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *E.g.*, *United States v. Christy*, 916 F.3d 814, 843 (10th Cir. 2019). As a particular application of that principle, the Court "ha[s] repeatedly reiterated that a conviction cannot be sustained if obtained by

piling inference on inference." *E.g.*, *United States v. Summers*, 414 F.3d 1287, 1294 (10th Cir. 2005). "The rule that prohibits the stacking of inference[s]" recognizes that "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based on the preceding one." *Id*.

Here, the gap between the evidence the government presented and the conclusion it seeks to draw is a chasm. The notion that the jury could conclude that Mr. Goldesberry acted knowingly from the Bartletts' response to what they supposedly heard is a textbook violation of the prohibition on piling inference upon inference. To conclude that Mr. Goldesberry acted knowingly on this theory, the jury would have had to draw (at a minimum*)* the following successive inferences:

1. That the Bartletts reacted the way they did because "K.G. had disclosed things other than the episode in bed with her dad," Gov't Br. at 33—and not, for example, because the Bartletts were disturbed about that one, particular incident.

2. That the "other things" the Bartletts supposedly heard about were other incidents of *child abuse* rather than, say, disclosures that Mr. Goldesberry was using drugs, stockpiling firearms, or engaging in some other form of completely unrelated dangerous behavior.

3. That the other incidents of child abuse that the Bartletts supposedly heard about were instances of *sexual* abuse rather than, for example, instances of non-sexual physical abuse.

6

4.    That the other incidents of sexual abuse the Bartletts supposedly heard about really occurred—i.e., that the supposed disclosures were accurate.[2]

5.    That the other hypothesized incidents of sexual abuse show that Mr. Goldesberry acted knowingly during the particular incident charged.

In short, the government's argument plainly contravenes "[t]he rule that prohibits the stacking of inference[s]." *Summers*, 414 F.3d at 1294. Further, some of the required inferences—individually—have such scant justification that they amount to leaps into the dark. Thus, the government's theory impermissibly requires such "a degree of speculation and conjecture" that it constitutes "a guess or mere possibility." *Christy*, 916 F.3d at 843.

In this regard, it's telling that prosecutors never argued anything like the government's appellate theory to the jury. *See* R. II:100-05, II:487-95, II:512-17. Given how it strains the trial evidence well past the breaking point, the government's appellate theory couldn't possibly have persuaded the jury. Instead, the theory backfires because it leaves the impression that the government is grasping at straws.

This Court should not be misled by the answer brief's tactic of emphasizing allegations the jury never heard. As explained above, the introductory sections of the government's brief stress Ms. Bartlett's claims that she was

---

[2] For the government's arguments that depend on *Mr.* Bartlett's reaction, the jury would have had to infer both (a) that the supposed disclosures to Ms. Bartlett were true and then (b) that Ms. Bartlett accurately relayed those disclosures to Mr. Bartlett.

told about years' worth of blatant sexual abuse involving Mr. Goldesberry using sex toys on his daughters and masturbating in front of them. And precisely because *we* already know that Ms. Bartlett was making these claims, it's easy for *us* to perceive the Bartletts' behavior—and to read their opaque testimony about hearing worrying "details" that "concerned" them—as stemming from and alluding to these other allegations.

But *the jury* did not hear about any other allegations of sexual abuse. It did not hear that Ms. Bartlett was told about anything except the one incident that K.G. told the jury about on the witness stand. And from *that* perspective—that is, based on the evidence presented at trial—the theory that Mr. Goldesberry committed additional acts of sexual abuse, and that these other acts could then be used to infer his *mens rea* in connection with the offense charged, is far too speculative to countenance.

**Second,** and in any event, the government's argument is nothing more than an elaborate attempt to circumvent the rule against hearsay. After all, the government's theory is that (1) it's possible to guess what K.G. and Faith told Ms. Bartlett and, (2) once those out-of-court statements are guessed, they can be treated as true and used to infer Mr. Goldesberry's intent. But that isn't allowed. Thus, even if it weren't impermissibly speculative, the government's appellate theory would have to be rejected because it asks the Court to uphold Mr. Goldesberry's conviction on improper grounds.

Under Federal Rules of Evidence 801 and 802—the rule against hearsay—an out-of-court statement generally can't be considered for the truth of

the matter asserted. The government explicitly acknowledges (at 38) that K.G.'s and Faith's (supposed) statements to Ms. Bartlett were inadmissible hearsay. And, importantly, the prosecution explicitly stated below that the limited testimony it presented regarding what Ms. Bartlett was told was *not* offered for the truth of the matter asserted. *See* ECF No. 46 at 14; R. I:63. Accordingly, the jury was not allowed to consider anything about what Ms. Bartlett was told for the truth of the matter asserted.

But that's *exactly* what the government is asking this Court to do. The government maintains that it's possible to piece together the hearsay that the jury was prohibited from hearing. And then, the government continues, once you creatively reconstruct the very allegations that were deliberately excluded from the trial, you can then use those reconstructed allegations to infer Mr. Goldesberry's intent. But it's not possible to do that without treating the reconstructed allegations as true and thereby using them (a) in violation of the rule against hearsay and (b) contrary to the prosecution's explicit representation that it was not offering any information about what Ms. Bartlett was told for the truth of the matter asserted.

What the government is doing might be more convoluted than the typical hearsay violation, but that makes things worse, not better. It would be nonsensical to say, on the one hand, that Ms. Bartlett's allegations were too unreliable for the jury to even hear about (because they're hearsay) but then to hold, on the other hand, that guesses about what those hearsay allegations might have been are not just permitted but sufficiently reliable to support

9

Mr. Goldesberry's conviction. The additional step of speculating about the content of an out-of-court statement, rather than hearing it directly, does not make the statement any less hearsay. It just superadds unreliability.

As noted, the prosecution did not argue this theory below. But if it *had* argued during closing that the jury should use the Bartletts' testimony to piece together the Goldesberry sisters' out-of-court statements and then consider those statements for the truth of the matter asserted, that would have been prosecutorial misconduct. *See, e.g., United States v. Caraway*, 534 F.3d 1290, 1299 (10th Cir. 2008) (error for the prosecution to urge the jury to put evidence to an improper use). And just as this would not have been a valid argument at trial, it isn't a valid theory on appeal.

### iii.   K.G. invariably said this was a single, accidental occurrence, and she never "recanted" anything.

The government's theory that K.G. originally disclosed blatant sexual abuse to Ms. Bartlett spawns a further theory—another one it never argued below—that K.G.'s trial testimony was a recantation of her original disclosure. *See* Gov't Br. at 18, 26, 31, 35-36, 42. As established above, however, the government's arguments about what Ms. Bartlett was supposedly told must be discarded. They are improperly grounded in extra-record evidence. They are incredibly speculative and violate the prohibition against piling inference upon inference. They violate the hearsay rule. And they breach the prosecution's explicit representation below that it was not admitting any-

thing about what Ms. Bartlett was told for its truth. And once the government's theory that K.G. originally disclosed blatant sexual abuse to Ms. Bartlett is discarded (as it must be), the extrapolation that K.G.'s exculpatory trial testimony was some kind of recantation falls apart.

The actual evidence presented at trial (in contrast to the government's unsupported story) established that K.G.'s account of what happened that night has been the same from the very beginning. Again, the jury heard that K.G. told Ms. Bartlett exactly what she said on the witness stand: that her father *accidentally* touched her *one time* in bed. *See* R. II:145-46. The jury heard that K.G. then told her mother (R. II:432-33) and the forensic interviewer (R. II:168-70, II:278-80, II:302-03) the same thing. The jury never heard anything to suggest that K.G. afterwards ever told anyone anything different. To the contrary, the jury heard that K.G. has always told anyone who asked that the touching was a one-time incident and that it was accidental. R. II:168-70. Accordingly, the answer brief's claim that K.G.'s exculpatory trial testimony somehow recanted an inculpatory account lacks foundation in the evidence presented at trial. Based on everything the jury heard, K.G.'s account of what happened that night never varied from the moment she first disclosed the incident in May of 2020 to the time of her March 2022 trial testimony.

The government offers another evidence-free story when it suggests (at 12, 15-16, 36-37) that K.G.'s testimony that she was twelve years old at the time of the incident was a reversal of something she'd said earlier. In reality, when K.G. first disclosed the incident to Ms. Bartlett in May of 2020, she told

her that it had happened "two to three years ago." R. I:146. This was entirely consistent with K.G.'s subsequent testimony that she was twelve, because she had turned twelve more than two years and eight months before her conversation with Ms. Bartlett. R. II:117, II:406. Contrary to what the answer brief repeatedly implies (at 7, 17, 20-21, 36), K.G. never told CPS investigator Brenna Gusman that the incident had happened three to four years earlier. Ms. Gusman interviewed *Mr. and Ms. Goldesberry*, and that's apparently what they told her. But Ms. Gusman never interviewed K.G. herself, because K.G. had already been subjected to a separate forensic interview—during which she never suggested that she was less than twelve at the time of the incident. R. II:154, II:355.

Relatedly, the Court should reject the answer brief's insinuation (at 12-14, 36-37) that Mr. Goldesberry's attorney cajoled K.G. into testifying that she was twelve at the time. In reality, it was the prosecutor who met with K.G. and relentlessly pressed her to wrack her brain for any information about her age. *See* R. II:156, II:172. As a result of this governmental pressure, K.G. considered a Facebook post of her family at the state fair and remembered that the incident occurred shortly after they attended the state fair—which the date on the post confirmed was just after her twelfth birthday. R. II:156, II:171-72; Gov't Ex. 5. That is hardly evidence of undue influence from defense counsel.

* * *

12

The answer brief's basic narrative has no support in the trial record. There was zero evidence that Mr. Goldesberry committed other acts of sexual abuse. And there was zero evidence that Meagan Bartlett heard anything other than precisely what K.G. said on the witness stand. The trial evidence showed that K.G. never recanted a prior account. It showed that, from the very beginning, K.G. always insisted that the touching was an accident and that nothing of the kind ever happened before or afterwards.

The government's belief in the veracity of Ms. Bartlett's hearsay accusations may explain its determination to maintain this prosecution despite the Goldesberrys' wrenching pleas not to destroy their family by imprisoning an innocent man. *See* Opening Br. at 15-19. But Ms. Bartlett's hearsay accusations form no part of the trial record and, accordingly, provide no basis for affirming Mr. Goldesberry's conviction.

### B. The government's other sufficiency arguments are meritless.

The government offers a hodgepodge of other arguments, but they're equally meritless.

**First,** the government argues (at 37-38) that the jury could reasonably reject the notion that Mr. Goldesberry was half-asleep when he touched K.G. But this is a red herring. Mr. Goldesberry's sufficiency argument places no reliance on the fact that he was half-asleep. It doesn't mention that even once. *See* Opening Br. at 23-37. The government falsely represents (at 37-38) that Mr. Goldesberry's argument on appeal is that no reasonable jury could conclude that he behaved knowingly because he was half-asleep. That is not so.

13

For the purposes of his sufficiency claim, Mr. Goldesberry's opening brief assumed *arguendo* that the jury could (contrary to the weight of the evidence) infer that he was not half-asleep at the time of the touching. And he demonstrated that, even granting that assumption, the evidence of *mens rea* was insufficient. Among other reasons, this is because uncontradicted evidence showed that Mr. Goldesberry would have assumed that he was in bed with his wife, that he would not have known that his daughter had laid down in his wife's place in the middle of the night, and that the entire incident was over so fast that Mr. Goldesberry would not have realized his mistake and stopped what he was doing before, in fact, he did stop what he was doing. *See* Opening Br. at 30-33. Thus, the government's argument that the jury could have concluded that Mr. Goldesberry was not half-asleep is beside the point. The opening brief doesn't argue otherwise.

**Second,** the government contends (at 38-39) that we can infer *mens rea* because Mr. Goldesberry would have been able to tell the difference between his wife's body and his daughter's—even in the dark. But the government just ignores the opening brief's preemptive refutation of this theory. As the prosecution itself put it below, the evidence showed that K.G. "reacted instantly" to being touched, R. II:513, and Mr. Goldesberry pulled his hand away immediately, R. II:174. Thus, there was no time for Mr. Goldesberry to register any palpable differences between his wife's and daughter's bodies before the whole thing was over. Because the touching was over as soon as it began, what the government needed was evidence that Mr. Goldesberry

14

*already* knew that K.G. was in bed with him *before* he reached over to touch her. There was no evidence of that—and there was unrebutted evidence to the contrary. *See* Opening Br. at 31.

In any case, all of the evidence showed that K.G. was a large and physically mature adolescent when this incident occurred. *See* R. II:142, II:177, II:422-26; Gov't Ex. 5. The government complains that Mr. Goldesberry relies on a photograph from 2017 to show what K.G.'s body would have been like at the time, and it wants the Court to look at photos from mid-2016 instead. But the jury specifically found that this incident occurred between the late Spring and early Fall of 2017. *See* R. I:142, I147.[3] Thus, photos from mid-2016 can't possibly be taken as a depiction of what K.G.'s body was like when this happened. Nevertheless, even in the Summer of 2016—*a year before* the jury found that the incident occurred—K.G. didn't have the body of a small child. Rather, she was as large or larger than her tenth-grade sister. *See* Gov't Ex. 2.

**Third,** the government contends (at 32-33) that Mr. Goldesberry's behavior after the incident evinced a consciousness of guilt. Again, Mr. Goldesberry preemptively addressed this in his opening brief (at 33-36), and the government has no answer for his arguments. To recapitulate, it was the *de-*

---

[3] The answer brief's continuous assertions (at 2, 12, 22, 26, 29, 36, 39) that K.G. may have been ten years old when this happened are irreconcilable with the verdict the government is defending. The jury found that it happened when she was nearly twelve. *See* R. II:117, I:142, I:147.

*fense's* theory at trial that Mr. Goldesberry, while maintaining that his conduct was accidental, felt guilty about the inherently shameful act of touching his daughter's vagina. R. II:170, II:302-03, II:331-32, II:499. His behavior upon learning that the incident had been reported to a child welfare agency—sobbing, saying that he'd messed up, and refusing a police interrogation—is perfectly consistent with the reaction of someone terrified of losing his family and his liberty over a horrifying accident that was being misconstrued as intentional. And because the facts "give[] equal or nearly equal circumstantial support" to theories of innocence and guilt, they don't help the government. *Lovern*, 590 F.3d at 1107.

**Fourth**, the government argues (at 34-36) that K.G.'s behavior after the incident was "consistent with" being a child abuse victim. But this couldn't possibly show that Mr. Goldesberry acted knowingly. Mr. Goldesberry's sufficiency claim concerns only his own mental state, not whether K.G. was subjected to an inappropriate sexual act. Mr. Goldesberry's argument stipulates that *the incident* happened. So K.G. behaving like it happened would prove nothing.

Things just get worse when you consider the particulars of the government's argument. For instance, the government says (at 26, 34-35) that K.G. engaged in self-harming behavior and that some child abuse victims also engage in self-harm. But the jury heard that K.G. suffers from Bipolar Disorder (a genetic psychiatric condition) and had endured multiple other traumas that had nothing to do with the incident for which Mr. Goldesberry was

being tried. *See* II:145, II:179-80 II:408-09. There was no testimony that self-harming behavior is a *distinguishing* characteristic of sexual abuse victims, as opposed to a generalized symptom of mental illness and trauma more broadly. Under the circumstances, attributing K.G.'s behavior to sexual abuse at the hands of her father would be nothing more than a guess. *See Christy*, 916 F.3d at 843. ("A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."). And, again, it's beside the point anyway: Even if K.G.'s self-harming behavior could be attributed to what Mr. Goldesberry did, that would say nothing about Mr. Goldesberry's *mental state*—which is the only thing at issue.

The government also says (at 34-36) that K.G.'s statements about the incident—for example, saying that Mr. Goldesberry barely touched her and that it was an accident—indicate that she's minimizing what happened. But this is circular reasoning. K.G. would also describe the incident like that if Mr. Goldesberry in fact barely touched her and she knew, based on all the surrounding circumstances, that it was an accident. The government's position seems to be that the more that K.G. protests that her father did *not* do this on purpose, the more we can conclude that he *did* do it on purpose. But that obviously isn't a reasonable inference.

Nor is that what the government's expert suggested. As explained in Mr. Goldesberry's opening brief (at 11-12), the forensic interviewer did *not*

testify that K.G.'s account of the incident indicates that something worse actually happened. To the contrary, the forensic interviewer acknowledged having no reason to believe that K.G.'s exculpatory account was anything other than 100% accurate. *See* R. II:294-98, II:309-14, II:319, II:322.

**Fifth,** and finally, the government argues (at 36-37) that the jury's verdict on the age element suggests that there was sufficient evidence on the *mens rea* element. While that obviously doesn't follow (they're different elements after all), it's nevertheless instructive to contrast the evidence on the age element with the evidence on the *mens rea* element. Doing so straightforwardly illustrates how the evidence on the latter element is insufficient.

On the age element, the evidence was in conflict. K.G. testified that the touching incident happened after she turned twelve. But Mr. Goldesberry told investigators it happened three or four years before May of 2020—when K.G. would have been under twelve. The jury chose to credit the evidence that K.G. was under twelve. And because credibility decisions are the jury's prerogative, Mr. Goldesberry can't complain that the evidence was legally insufficient on the age element.

The *mens rea* element is a different story. On that element, it doesn't matter which testimony the jury chose to accept. That's because the jury didn't hear *any* version of what happened that permitted it to conclude that Mr. Goldesberry acted with knowledge. Even if you spot the government every credibility judgment in the whole trial, there still wasn't proof beyond a reasonable doubt. And because the government bore the burden of proof,

it's self-defeating for the government to contend—as it does throughout its brief—that we can just toss out both K.G.'s and Mr. Goldesberry's accounts of what happened. They were the only people there. If you don't believe either of them, what's left is the presumption of innocence.

* * *

The Court should reverse and direct a judgment of acquittal.

## II.    The Prosecution's Plain Misconduct Warrants a New Trial.

Because Mr. Goldesberry is entitled to a judgment of acquittal on his sufficiency claim, the Court need not determine the extent to which prosecutorial misconduct contributed to his wrongful conviction. But if the Court does consider the issue, it should hold that the prosecution's summation was plainly improper and affected Mr. Goldesberry's substantial rights.

### A.    Mr. Goldesberry was prejudiced by remarks the government admits were plainly improper.

Mr. Goldesberry's opening brief showed (at 38-40) that the prosecution committed plain misconduct when—across five paragraphs of its rebuttal closing—it falsely but confidently told the jury that K.G. had never testified that she heard Mr. Goldesberry snoring or saw that his eyes were closed at the time of the touching. The government acknowledges (at 45) that the prosecutor misstated K.G.'s testimony. It contends, however, that such plainly improper remarks did not affect Mr. Goldesberry's substantial rights. The government is wrong. While the jurors were not obligated to accept K.G.'s testimony that Mr. Goldesberry was half-asleep at the time, *see supra* at 13-

14, if the prosecution had not falsely assured them that no such testimony was given, the jurors might have decided to treat it as contributing to reasonable doubt that Mr. Goldesberry acted with knowledge.

Contrary to what the government contends (at 45-47), there's a reasonable likelihood that the prosecution's false statements prejudiced Mr. Goldesberry even though the jurors were generally warned that lawyers' arguments aren't evidence and that the jurors' own recollections are controlling. As explained in Mr. Goldesberry's opening brief (at 48 n.8, 51), this is so for two reasons. First, the jury wasn't given a *curative* instruction. The jurors were not advised that the prosecutor had misstated K.G.'s testimony, nor were they directed to disregard the offending remarks. Second, the stock warnings were largely beside the point. The danger was not that the jury would treat the prosecutor's assertions as evidence. Nor was it that jurors would treat the prosecutor's professed memory of K.G.'s testimony as binding. Rather, the danger was that the prosecutor's self-assured declarations would taint the jurors' own memories of K.G.'s testimony. After all, the *whole point* of the prosecutor's erroneous "correction" of the defense's closing was to persuade the jurors to remember K.G.'s testimony as the prosecutor was falsely describing it.

The two cases cited by the government don't show that this prosecutorial misconduct was harmless.

In *United States v. Sorensen*, this Court held that a prosecutor's misstatement was not prejudicial because the defense interposed a contemporaneous

objection and the judge—right then and there—instructed the jurors to disregard any argument that disagreed with their own memories of the evidence. 801 F.3d 1217, 1242 (10th Cir. 2015). That sequence of events would have conveyed to jurors that the prosecutor's description of the evidence was, at a minimum, dubious. But nothing like that happened here. In this case, there was no contemporaneous challenge to, or instruction addressing, the prosecutor's misstatements about K.G.'s testimony. Such silence tended to leave the impression that the prosecution's false statements were accurate.

The *Sorensen* Court addressed a second, unpreserved instance of the prosecutor misstating the evidence and held that it didn't affect the defendant's substantial rights where the evidence against the defendant was strong and the misstatement was trivial. 801 F.3d at 1242-43. Similarly, in *United States v. Rogers*, an arguably improper remark was dismissed as harmless where the government's case was "very strong" and the potentially improper remark was fleeting. 556 F.3d 1130, 1141 (10th Cir. 2009). Again, Mr. Goldesberry's case is different. Here, the government's case was weak. The prosecutor misstated the central witness's testimony regarding the central issue. And the misstatements were pointed and protracted.

The Court should thus hold that the prosecutor's plainly improper misstatement of K.G.'s testimony affected Mr. Goldesberry's substantial rights. And, in any case, even if this one instance of misconduct were not sufficiently prejudicial on its own, when it is viewed in combination with the other instances of misconduct identified in the opening brief (at 40-52), the

21

cumulative impact rises to the level of an effect on Mr. Goldesberry's substantial rights.

### B. The other prosecutorial remarks challenged by Mr. Goldesberry were plainly improper.

The government doesn't dispute that the other three remarks challenged by Mr. Goldesberry may have affected the outcome. Instead, it claims that these remarks were appropriate because they urged the jury to draw permissible inferences from the evidence. This Court should instead conclude that the additional challenged remarks were plainly improper.

### i. Improperly arguing character.

The opening brief challenged as misconduct the prosecution's diatribe condemning Mr. Goldesberry for, in the prosecutor's telling, expelling K.G. from her home to suit his own convenience. *See* Opening Br. at 41-43 (quoting the remarks). Mr. Goldesberry maintains that this argument distorted the facts and, more importantly, amounted to an improper attack on his character. The government denies that the prosecutor's argument was about Mr. Goldesberry's character, but the denial is unconvincing.

According to the government (at 42), the prosecutor was instead arguing that the jury should credit K.G.'s inculpatory statements to Meagan Bartlett over K.G.'s exculpatory trial testimony because, while the "original disclosure" was pure and unbiased, K.G.'s "recant[ation]" at trial was in response to "experienc[ing] the negative consequence of being sent away." But this couldn't possibly be what the prosecutor was driving at. That's because

the theory that K.G. made a damning original disclosure that was recanted by her trial testimony is a post-hoc appellate invention. That theory has no grounding in the evidence presented at trial and bears no resemblance to anything the prosecution argued to the jury. *See* R. II:100-05, II:487-95, II:512-17. Accordingly, while the answer brief's explanation could work in a different case, where totally different evidence and arguments were presented, it doesn't work in our case.

Instead, as the opening brief shows (at 41-43), the trial prosecutor was making the plainly improper argument that Mr. Goldesberry is a cold and selfish person and is, therefore, the type of person who could commit the crime charged. And this is surely how the remarks would have been received by the jurors given the facts and arguments that they had—and hadn't—been exposed to.

### ii. Falsely saying that K.G. routinely got into her parents' bed.

Mr. Goldesberry's opening brief (at 40-41) also challenged as misconduct the prosecutor's assertion that K.G. *routinely* got into her parents' bed in the middle of the night. This was plainly improper because the only evidence regarding how often K.G. got into her parents' bed was the testimony of K.G. and Ms. Goldesberry, both of whom explicitly told the jury that she did *not* do so regularly. R. II:173-74, 404. In response, the answer brief first suggests (at 44) that there was some ambiguity in K.G.'s testimony. But there

wasn't. The only time that K.G. was asked how often she got into her parents' bed was on cross-examination, and she unequivocally responded that she only did so "[s]everal times collectively over the years" and that "it wasn't something that [she] did regularly." R. II:173-74. There's simply no way to spin K.G.'s testimony as supporting an inference that it was routine.

The government next suggests (at 45) that the prosecution showed that K.G. and her mother were biased and, consequently, could posit the opposite of what they said. But that isn't so. The "maximum legitimate effect" of impeaching a witness "can never be more than the cancellation of" the testimony impeached. *United States v. Ragghianti*, 560 F.2d 1376, 1381 (9th Cir. 1977). Accordingly, if we spurn the testimony of Mr. Goldesberry's wife and daughter because they maintain his innocence and want him to come home, that leaves the record devoid of any evidence regarding how often K.G. got into her parents' bed and, thus, still devoid of any basis for the prosecution to assert that she did so routinely. Simply put, if bias negates the only relevant evidence, that does not license the prosecution to just assert that whatever it wants to be true is fact.

### iii.    Baselessly blaming Mr. Goldesberry for K.G.'s mental health problems.

The opening brief additionally claimed (at 44-46) that the prosecution made plainly improper remarks when it baselessly asserted that Mr. Goldesberry was to blame for K.G.'s mental health problems because he abused her and then made her keep quiet about it. In reality, the evidence showed

that K.G. suffers from a genetic psychiatric condition and that this was exacerbated by K.G. being severely bullied in school and being an eyewitness to the deaths of her beloved grandparents. R. II:178-84, II:408-09. And the evidence showed that Mr. Goldesberry wanted to immediately tell Ms. Goldesberry about the accident in bed but acquiesced to K.G.'s wishes to keep the matter between the two of them. K. II:176-77, II:402-03.

Without even attempting to explain how the prosecutor's inflammatory remarks had any legitimate bearing on Mr. Goldesberry's guilt of the crime charged, the answer brief argues once again (at 43-44) that the prosecution was entitled to simply disregard K.G.'s testimony and assert the opposite. Once again, the Court should reject this idea.

Contrary to what the government contends (at 43), the mere fact that K.G.'s need for treatment arose sometime *after* the incident with her father doesn't make it reasonable to infer that K.G.'s need for treatment arose as a *result of* the incident with her father. That's because K.G.'s need for treatment also arose after she experienced severe bullying and suffered the loss of her grandparents—and it was specifically for those things, rather than anything to do with her father, that K.G. sought and received therapy. R. II:144, II:183.

Lastly, the prosecution was not urging a reasonable inference from the evidence when it told the jury—in the teeth of K.G.'s explicit testimony to the contrary—that Mr. Goldesberry made her stay quiet about the incident. The government conspiratorially theorizes (at 44) that Mr. Goldesberry was engaged in a convoluted effort to implicitly induce K.G. to keep it a secret

while making her think the secrecy was her own idea. But that's so specula-tive that it's indistinguishable from just making stuff up—which obviously isn't allowed.

* * *

Accordingly, if the Court doesn't order an acquittal due to insufficient evidence, it should order a new trial due to prosecutorial misconduct.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

*Josh Lee*

JOSH LEE
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, Colorado 80202
(303) 294-7002
josh.lee@fd.org
Counsel for Appellant

## Certificate of Compliance

I hereby certify that, to the best of my knowledge and belief, formed after a reasonable inquiry, this brief is proportionally spaced and contains 6,479 words and therefore complies with the applicable type-volume limita-tions.

*Josh Lee*

JOSH LEE
Assistant Federal Public Defender